Mary RICHARDSON, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 24A05–0510–CR–612.

Court of Appeals of Indiana.

Nov. 20, 2006.

Susan K. Carpenter, Public Defender of Indiana, David P. Freund, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

RILEY, Judge.

## STATEMENT OF THE CASE

Appellant–Defendant, Mary Richardson (Richardson), appeals her conviction for Count I, dealing in methamphetamine, a Class A felony, Ind.Code § 35–48–4–1(a)(2)(C), (b)(1); Count II, possession of methamphetamine, a Class C felony, I.C. § 35–48–4–6(b)(1)(A); Count III, illegal drug lab, a Class D felony, I.C. § 35–48–4–14.5(c); Count IV, possession of marijuana, a Class D felony, I.C. § 35–48–4–11; Count V, maintaining a common nuisance, a Class D felony, I.C. § 35–48–4–13(b)(2)(A); and Count VI, neglect of a dependent, a Class D felony, I.C. § 35–46–1–4(a)(1).

We affirm in part, reverse in part, and remand.

## ISSUES

Richardson raises three issues on appeal, which we restate as:

(1) Whether the State presented sufficient evidence to sustain Richardson's convictions for dealing in methamphetamine and illegal drug lab;

(2) Whether Richardson was denied her Sixth Amendment right to confrontation; and

(3) Whether Richardson's convictions for dealing in methamphetamine and possession of methamphetamine violate Indiana's prohibition against the imposition of multiple punishments.

## FACTS AND PROCEDURAL HISTORY

On December 10, 2003, Dillon Richardson (Dillon), seventeen, visited his father Tommy Richardson (Tommy) at approximately 5 p.m. Dillon did not live with his father, but visited him often. Tommy lived in a mobile home near Laurel, Indiana in Franklin County with his wife, Richardson, and their six-year old son, J.R.

That evening, Richardson, Tommy, J.R., and Robert Morning (Morning), Tommy's nephew and Dillon's cousin, were all at Tommy and Richardson's home when Dillon arrived. Between 8 and 10 p.m. Morning asked Dillon to drive him to the Wal–Mart in Greensburg, Dillon obliged. Morning purchased several boxes of cold tablets and lithium batteries, after which Dillon drove them back to Richardson and his father's mobile home. A few hours later Morning asked Dillon to drive him "up the road." (Transcript p. 169). Dillon drove the two toward Rushville. He stopped the car at Morning's insistence near a Co-op and let Morning out of the car. Dillon went up the road, turned

around, and came back to pick up Morning. When Morning got back in the car he had a pitcher full of anhydrous ammonia, and according to Dillon the smell was "horrible, [took] your breath." (Tr. p. 171). Dillon drove them back to the mobile home once again, arriving at approximately midnight.

Dillon went into the mobile home only to behold Tommy and Richardson crushing up the cold pills and peeling the lithium batteries Morning bought earlier that evening. All the while, J.R. was sleeping on the couch. When Dillon got ready to leave, Tommy and Morning were outside turning cans of ether upside down and punching a hole in them to release the pressure while still preserving the liquid. Before Dillon left, Richardson and Tommy asked him if he would come back later and take them to Rushville so they could get rid of their methamphetamine.

At approximately 1:30 or 2 a.m., Dillon called Franklin County Sheriff Dale Maxie (Sheriff Maxie) and reported what he witnessed at Richardson and his father's home. Sheriff Maxie obtained a search warrant for the mobile home and the surrounding grounds to search for an "active meth lab." (Tr. p. 198). Deputy Sheriff John Roberts (Deputy Roberts), and Indiana State Police Trooper Rick Gill (Trooper Gill) accompanied Sheriff Maxie to aid in the execution of the search warrant.

For fear of giving themselves away, the officers parked their vehicles approximately one mile from Richardson's residence and walked to the mobile home. Trooper Gill approached the mobile home, peered through a window, and signaled to Sheriff Maxie and Deputy Roberts that he saw three persons inside. Trooper Gill also observed a liquid on a ceramic plate sitting on the table. Sheriff Maxie and Deputy Roberts went to the back door while

Trooper Gill drew his gun and positioned himself at the front door. Deputy Roberts knocked and announced their presence, and immediately opened the unlocked back door. After hearing Deputy Roberts' announcement, Tommy opened the front door. He was carrying a glass jar with a liquid in it. Upon coming face to face with Trooper Gill at the front door, Tommy slammed the door in his face. Trooper Gill opened the door and followed Tommy into the mobile home. Upon entering, Trooper Gill's eyes, nose, and throat immediately began to burn. Trooper Gill was not able to catch Tommy before he poured the liquid down the sink and turned on the water. Trooper Gill reached to turn off the water when Tommy grabbed his arm. The two struggled before Trooper Gill was able to handcuff Tommy.

When Sheriff Maxie and Deputy Roberts entered the mobile home, a strong ammonia odor immediately burned their eyes and lungs, and made breathing difficult. Deputy Roberts saw a "white solvent cloud" hanging in the air. (Tr. p. 218). Sheriff Maxie found Morning sitting on a couch. Deputy Roberts found Richardson and J.R. in the master bedroom in the back of the residence. He handcuffed Richardson and told both she and J.R. to stay there. Deputy Roberts then went into the front room where Sheriff Maxie had Morning in a prone position on the floor. When they turned Morning over to handcuff him they found a plastic bag containing a white powder, later determined to be .36 grams of methamphetamine. Another larger plastic bag containing a white powder, later determined to be 3.06 grams of methamphetamine, was found under a love seat not far from where Morning was laying on the floor.

After Richardson, Tommy, and Morning were secured, everyone was brought into the living room. Deputy Roberts went to

get his patrol car so they could get J.R. out of the mobile home since it looked like he was having trouble breathing. At approximately 5:45 a.m. Richardson and J.R. were placed in Deputy Roberts' patrol car. Deputy Roberts turned on the video recorder in his patrol car before locking them inside. Several comments made by Richardson were caught on tape. At 5:45 a.m. Richardson is on tape as having said, "Those two men, the cause of it. I begged my way out, and begged my way out. Tell them I wasn't doing anything." (Appellant's App. p. 13). At 5:48 a.m. she said, "You've got to tell them Mommy didn't smoke no ... with them." (Appellant's App. p. 13). At 5:58 a.m. she said, "I don't know where they parked, came from. I didn't see no lights." (Appellant's App. p. 13). At 6:00 a.m. she said, "I heard Dillon's mouth talking to those cops. It definitely was Dillon." (Appellant's App. p. 13). And at 6:02 a.m., she said, "We're not the only ones [that] should be busted." (Appellant's App. p. 13). J.R. was eventually taken to Fayette Memorial Hospital. Trace positive results were found for trace amounts of cocaine, amphetamine, and opiates in his system.

Outside, a strong ammonia odor was detected from a shed behind the mobile home. Inside the shed, a plastic jug with smoke coming out of some attached tubing was found. Due to the noxious odors coming from both the mobile home and the shed, no further investigation was conducted until the Indiana State Police Clandestine Laboratory Team could arrive, process, and decontaminate the scene.

After the scene was decontaminated, marijuana was found inside a doghouse behind the mobile home, inside the mobile home in a bag of dog food above the washing machine, and in the master bedroom. Three plants were found, each containing marijuana. In the shed a plastic half-gallon bucket containing grey sludge, later determined to be the residue of crushed up cold pills, ammonia, and lithium, was found.[1] A glass jar with ether, an organic solvent used in the manufacturing of methamphetamine, was also found in the shed. Outside the shed, battery strippings and a plastic soda bottle with a hole drilled through the cap with salt residue in the bottom were found at the bottom of a burn barrel. It was determined that methamphetamine was being manufactured in the shed.

Inside the mobile home, a light bulb with the metal end hollowed out and a plastic pen barrel were found on the dining room table, and a small glass vial was found in a boot in the master bedroom, all of which are used to ingest methamphetamine. A gravity-type postage scale, which can be used to weigh amounts of drugs, was also found in the dining room.[2] Additionally, particles of methamphetamine were found on a plate sitting on the dining room table.

On December 16, 2003, the State filed an Information charging Richardson with Count I, dealing in methamphetamine, a Class A felony; Count II, possession of methamphetamine, a Class C felony; Count III, illegal drug lab, a Class D felony; Count IV, possession of marijuana, a Class D felony; Count V, maintaining a

---

1. Those three ingredients are mixed together in the first step of manufacturing methamphetamine.

2. Trooper Gill testified that the scale found would weigh amounts up to one hundred grams and that it was unlikely it would be used to weigh out small amounts of methamphetamine. Rather, it would be used to roughly weigh bags of marijuana to see if they are over thirty grams, as opposed to weighing fractions of a gram for packaging methamphetamine.

common nuisance, a Class D felony; and Count VI, neglect of a dependent, a Class D felony. On August 1, 4, and 5, 2004, a jury trial was held. The jury found Richardson guilty on all counts.

On August 26, 2005, a sentencing hearing was held. The trial court sentenced Richardson to thirty years on Count I, four years on Count II, eighteen months on Count III, eighteen months on Count IV, eighteen months on Count V, and eighteen months on Count VI. The trial court ordered all sentences be served concurrent.

Richardson now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

Richardson first contends the evidence presented at trial was insufficient to support her conviction. Specifically, Richardson argues that the State failed to prove beyond a reasonable doubt that (1) she possessed methamphetamine with the intent to deliver, and (2) she possessed anhydrous ammonia with the intent to manufacture methamphetamine.

■ Our standard of review for a sufficiency of the evidence claim is well settled. In reviewing sufficiency of the evidence claims, we will not reweigh the evidence or assess the credibility of the witnesses. *Cox v. State*, 774 N.E.2d 1025, 1028–29 (Ind.Ct.App.2002). We will consider only the evidence most favorable to the judgment, together with all reasonable and logical inferences to be drawn therefrom. *Alspach v. State*, 755 N.E.2d 209, 210 (Ind. Ct.App.2001), *trans. denied*. The conviction will be affirmed if there is substantial evidence of probative value to support the conviction of the trier of fact. *Cox*, 774 N.E.2d at 1028–29. A judgment based on circumstantial evidence will be sustained if

the circumstantial evidence alone supports a reasonable inference of guilt. *Maul v. State*, 731 N.E.2d 438, 439 (Ind.2000). We will address each conviction separately.

### A. *Dealing in Methamphetamine*

■ Richardson argues that while she constructively possessed the methamphetamine found in her home, she did not possess it with the intent to deal in methamphetamine.

I.C. § 35–48–4–1(a)(2)(C), (b)(1), in pertinent part, states:

A person who possesses, with intent to deliver cocaine or a narcotic drug, pure or adulterated, classified in schedule I or II, commits dealing in cocaine or a narcotic drug, a Class A felony if the amount of the drug involved weighs three (3) grams or more.

Therefore, to convict Richardson for possession of methamphetamine with intent to deliver, a Class A felony, the State was required to prove beyond a reasonable doubt that Richardson possessed methamphetamine in an amount greater than three grams with intent to deliver it. *See* I.C. § 35–48–4–1(a)(2)(C), (b)(1).

■ Intent, being a mental state, can only be established by considering the behavior of the relevant actor, the surrounding circumstances, and the reasonable inferences to be drawn therefrom. *Davis v. State*, 791 N.E.2d 266, 270 (Ind.Ct.App. 2003), *reh'g denied, trans. denied*. Circumstantial evidence showing possession with intent to deliver may support a conviction. *Id.* Possessing a large amount of a narcotic substance is circumstantial evidence of intent to deliver. *Id.* The more narcotics a person possesses, the stronger the inference that he intended to deliver it and not consume it personally. *Id.* Additionally, we reiterate that we may not substitute our own judgment for that of the

jury. *McHenry v. State,* 820 N.E.2d 124, 127 (Ind.2005).

Richardson is asking us simply to substitute our own inferences from those made by the jury. We decline such an invitation. Rather, we find that based on the amount of methamphetamine present—over 3 grams, the presence of a scale, and the fact that Richardson and Tommy asked Dillon to come back later so they could "get rid of their stuff" is sufficient to affirm Richardson's conviction for dealing in methamphetamine. (Tr. p. 173).

### B. *Possession of Precursors*

Richardson also contends there is insufficient evidence to support her conviction for possession of anhydrous ammonia. Specifically, Richardson argues that the State did not prove beyond a reasonable doubt that she possessed anhydrous ammonia, constructively or actually, with the requisite intent to sustain her conviction for illegal drug lab.

I.C. § 35–48–4–14.5(c), in pertinent part, states:

A person who possesses anhydrous ammonia or ammonia solution (as defined in [I.C. § 22–11–20–1]) with the intent to manufacture methamphetamine or amphetamine, schedule II controlled substances under [I.C. § 35–48–2–6], commits a Class D felony.

In *Bush v. State,* 772 N.E.2d 1020, 1022–23 (Ind.Ct.App.2002), *trans. denied,* this court held that the State presented sufficient evidence to prove that Bush knowingly or intentionally manufactured methamphetamine where the police found several items used to manufacture methamphetamine at his residence. Additionally, in *Floyd v. State,* 791 N.E.2d 206, 210–11 (Ind.Ct.App.2003), we held that constructive possession of precursors, chemical reagents, and equipment necessary to manufacture methamphetamine was suffi-

cient to prove possession of precursors with the intent to manufacture methamphetamine.

However, Richardson notes that in *Livermore v. State,* 777 N.E.2d 1154, 1162 (Ind.Ct.App.2002), the only evidence this court found suggesting the presence of ether was the police chief's testimony of "an odor of anhydrous ammonia and starting fluid or ether." *Id.* As such, we found that "absent any evidence that the defendant possessed receptacles containing ether or an ether-containing substance, testimony regarding an odor of ether is insufficient to prove the possession of ether." *Id.* Thus, Richardson posits that we should accordingly find the testimony of the officers regarding the smell in the mobile home, the white solvent cloud hanging in the air, and the lack of any receptacles containing anhydrous ammonia insufficient to prove she possessed anhydrous ammonia. We decline Richardson's invitation.

Actual possession of anhydrous ammonia is not the only avenue available to support Richardson's conviction; constructive possession of anhydrous ammonia is also satisfactory. Constructive possession is established by showing that the defendant has both the intent and capability to maintain dominion and control over the contraband. *Floyd,* 791 N.E.2d at 210. In cases where the accused has exclusive possession of the premises on which the contraband is found, an inference is permitted that he or she knew of the presence of contraband and was capable of controlling it. *Id.* However, when possession of the premises is non-exclusive, the inference is not permitted absent some additional circumstances indicating knowledge of the presence of the contraband and the ability to control it. *Id.* Among the recognized "additional circumstances" are: (1) incriminating statements by the defendant;

(2) attempted flight or furtive gestures; (3) a drug manufacturing setting; (4) proximity of the defendant to the contraband; (5) contraband is in plain view; and (6) location of the contraband is in close proximity to items owned by the defendant. *Id.* at 210–11.

Here, Richardson did not have exclusive possession over the mobile home. However, the State provided evidence of additional circumstances, which support an inference that Richardson had both the intent and capability to maintain dominion and control over the mobile home. First, Richardson made incriminating statements that were recorded while she and J.R. were in Deputy Robert's police car. Second, Trooper Gill saw three people in the living room before entering the residence, only to find Richardson in the bedroom with her son upon entry, indicating her desire to distance herself from an incriminating setting. And, third, Dillon testified she saw Richardson and his father, Tommy, crushing cold pills and stripping lithium from batteries.

Moreover, ammonia was a component of the grey sludge found in the shed. The Officers also found other items commonly used in manufacturing methamphetamines and testified that in their expert opinions Richardson's property was the setting of methamphetamine manufacturing. Accordingly, we find the State presented sufficient evidence to support Richardson's conviction for possession of precursors.

## II. *Sixth Amendment Right to Confrontation*

■ Next, Richardson contends that the trial court abused its discretion by admitting J.R.'s medical records. Particularly, Richardson claims her Sixth Amendment right to confrontation was violated because J.R.'s medical records constitute *testimonial* evidence pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354,

158 L.Ed.2d 177 (2004), and fails to otherwise fall within a recognized hearsay exception.

■ An Indiana defendant has never before specifically challenged this issue. However, this court, in *Smith v. State*, 839 N.E.2d 780 (Ind.Ct.App.2005), cursorily addressed this issue in a footnote. *See Smith*, 839 N.E.2d at 784 n. 4. As the specific issue has been raised in the instant case and as we do not decide cases in footnotes, we feel it necessary to expand upon the *Smith* footnote.

■ The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." The Confrontation Clause has been deemed a bedrock of procedural guarantees and applies to both federal and state criminal prosecutions. *See Crawford*, 541 U.S. at 42, 124 S.Ct. 1354; *see also Wallace v. State*, 836 N.E.2d 985, 992 (Ind.Ct.App.2005).

In *Crawford*, the Supreme Court considered whether an out-of-court statement, admitted pursuant to a hearsay exception or because it met some other guarantee of trustworthiness, violated a criminal defendant's Sixth Amendment right to confront witnesses against him when the declarant is unavailable. *Wallace*, 836 N.E.2d at 992. Before deciding the issue, the Supreme Court engaged in a careful analysis of the language found in the constitutional provision as well as the historical background of the Confrontation Clause. *Id.* Subsequent to its analysis and historical review, the Supreme Court determined there were two inferences that must be understood to properly understand the meaning of the Confrontation Clause. *Id.* The first inference was the use of *ex parte* communications (testimony) as evidence against the accused. *Id.* at 992–23. The

second inference the Supreme Court addressed was "that the Framers would not have allowed admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross examination." *Id.* at 993.

In essence, *Crawford* drew a line between testimonial and non-testimonial hearsay without providing a definition of testimonial evidence,[3] providing the States latitude for developing their hearsay laws in relation to non-testimonial hearsay. However, the Supreme Court did comment on existing hearsay exceptions, stating, "[m]ost hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Crawford,* 541 U.S. at 56, 124 S.Ct. 1354.

In the instant case, Richardson's sole argument is that J.R.'s medical records, admitted over objection as a violation of the Sixth Amendment's Confrontation Clause, were testimonial in nature. In light of that argument, we find no persuasive reasoning posited by Richardson to cause us to disagree with the Supreme Court's rule as stated in *Crawford* that business records by their very nature are *not* testimonial. *See Crawford,* 541 U.S. at 56, 124 S.Ct. 1354. We conclude the trial court did not abuse its discretion by admitting J.R.'s medical records pursuant to Indiana Evidence Rule 803(6).

### III. *Double Jeopardy*

█ Lastly, Richardson argues her conviction and subsequent sentence for both Count I, dealing in methamphetamine, and Count II, possession of methamphetamine, violates Indiana's rule prohibiting the imposition of multiple punishments. The State concedes and we agree.

█ The Fifth Amendment double jeopardy clause of the United States Constitution states that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." *Laux v. State,* 821 N.E.2d 816, 819 (Ind.2005). There are three protections in the double jeopardy clause, one of which is protection against multiple punishments for the same offense. *Id.* The Indiana Constitution in Article I, section 14 provides, "No person shall be put in jeopardy twice for the same offense." Two or more offenses are the "same offense" in violation of Art. I, § 14, if, with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one charged offense also establish the essential elements of another charged offense. *Patton v. State,* 837 N.E.2d 576, 581 (Ind.Ct.App.2005).

█ It has been held that possession is a lesser-included offense of possession with intent to deliver. *See Kendall v. State,* 825 N.E.2d 439, 453 (Ind.Ct.App.2005). Accordingly, as long as the trial court does not enter a judgment of conviction and sentence on each of the verdicts there is no cognizable double jeopardy violation. *Kilpatrick v. State,* 746 N.E.2d 52, 60 (Ind. 2001). But, if the trial court does enter a judgment of conviction and sentence on each of the verdicts, then a judgment of conviction and sentence must be vacated. Thus, Richardson's conviction for Count II, possession of methamphetamine, must be vacated.

---

**3.** We note that *Crawford* has been expanded upon and clarified by *Hammon v. State,* which was decided together with *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (June 19, 2006), but do not believe those decisions affect our result in the instant case.

*CONCLUSION*

Based on the foregoing, we find (1) the State presented sufficient evidence to sustain Richardson's conviction for dealing in methamphetamine and illegal drug lab, (2) Richardson was not denied her Sixth Amendment right to confrontation, and (3) Count II, possession of methamphetamine, must be vacated to avoid violating Indiana's prohibition against the imposition of multiple punishments.

Affirmed in part, reversed in part, and remanded.

BAILEY, J., and MAY, J., concur.