# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
January 8, 2008 Session

## STATE OF TENNESSEE  v.  KACY DEWAYNE CANNON

**Appeal by permission from the Court of Criminal Appeals**
**Criminal Court for Hamilton County**
**No. 243913     Rebecca J. Stern, Judge**

_____

### No. E2005-01237-SC-R11-CD - Filed April 29, 2008

_____

Defendant was convicted of aggravated rape.  The Court of Criminal Appeals affirmed his conviction but remanded for re-sentencing.  Thereafter, we granted permission to appeal to consider the following issues:  1) whether the State failed to establish a proper chain of custody for the admission into evidence of pantyhose the victim was allegedly wearing at the time of the rape; 2) whether the evidence is sufficient to support the conviction; 3) whether the trial court erred in denying the defense motion to suppress the identification of his DNA profile from a DNA database; 4) whether admission of the victim's statements into evidence through third parties violated Defendant's constitutional right of confrontation; 5) whether the friendship between the trial court and one of the prosecuting attorneys created a serious appearance of impropriety and biased the trial court against Defendant; and 6) whether the Court of Criminal Appeals erred by remanding this case for re-sentencing.  After considering these issues, we conclude that the State failed to establish a proper chain of custody for the admission into evidence of the pantyhose and that the victim's statements describing the assault to the police officers and her statements to the sexual assault nurse examiner were testimonial and admitted in violation of Defendant's right of confrontation. We further hold that the trial court properly denied Defendant's motion to suppress and Defendant's motion for recusal.  Because the error in admitting the pantyhose into evidence was not harmless, however, we reverse Defendant's conviction for aggravated rape and remand for a new trial.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals is Affirmed in Part and Reversed in Part and Remanded**

WILLIAM M. BARKER, C.J., delivered the opinion of the court, in which JANICE M. HOLDER, CORNELIA A. CLARK, and WILLIAM C. KOCH, JR., JJ., joined.  GARY R. WADE, J., filed a concurring opinion.

Ardena J. Garth, District Public Defender, and Donna Robinson Miller, Assistant District Public Defender, Chattanooga, Tennessee, for the appellant, Kacy Dewayne Cannon.

-1-

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Leslie Price, Assistant Attorney General; William Cox, III, District Attorney General; Mary Sullivan Moore and Boyd Patterson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

### I. Factual Background

On November 18, 1999, eighty-two year old M.N.[1] reported that an unknown assailant raped her late in the afternoon in her Hamilton County home. Officer Damany Norwood ("Officer Norwood") of the Chattanooga Police Department ("CPD") was the first police officer to respond to M.N.'s 911 call. Officer Norwood testified that M.N. was visibly upset and that her whole body was shaking. M.N. described the attack and the perpetrator to Officer Norwood, who recorded her statements. Over Defendant's objections, Officer Norwood testified that M.N. told him that prior to the attack, M.N. and her sister had been sitting on M.N.'s porch when an unknown, young African-American man walked past her house. After her sister left, this same young man again walked by M.N.'s house and stopped to ask for a cup of water. M.N. said she would get him a cup of water, but told him to stay where he was. She gave him a paper cup of water from which the man took one drink. He threw out the rest of the water and started complaining about the water. M.N. began to close the door and the man then unexpectedly pushed M.N. from behind into the house and forced her onto a living room couch, covered her face with a pillow from the couch, raped her, and fled.

After speaking with Officer Norwood, M.N. was transported by ambulance to the emergency room at Memorial Hospital. Meanwhile, the police questioned M.N.'s neighbors and sister about the attack. Detective Charles Dudley ("Detective Dudley") of the CPD's Major Crimes/Homicide Division testified that two neighbors reported seeing a young African-American man wearing faded blue jeans and a teal jacket sitting on M.N.'s porch. Relying on this description, the police canvassed the neighborhood and quickly apprehended Elijah Ellington, who matched the neighbors's description. The police returned Mr. Ellington to the scene, and the neighbors identified him as the young man they had seen sitting on M.N.'s porch.[2] Furthermore, at Mr. Ellington's subsequent preliminary hearing following his arrest, all of the State's witnesses, including M.N., identified Mr. Ellington as the perpetrator.

Julie Marston, a nurse at Memorial Hospital's emergency room, testified from M.N.'s medical records that M.N. was treated for various injuries based upon her complaint that she had been sexually assaulted. After emergency room personnel completed their treatment of M.N.,

---

[1] It is the policy of this Court not to identify by name the victims of sexual offenses. Therefore, we refer to the victim in this case only by her initials.

[2] The neighbors maintained that their identification of Mr. Ellington was based on his facial features and not his clothing.

Ardyce Redolfo ("Nurse Redolfo"), a specially-trained sexual assault nurse employed by the Sexual Assault Crisis Center, examined M.N. as part of the police investigation to determine the extent of her injuries and to collect any evidence that could be used by the police in apprehending her attacker. Nurse Redolfo testified that she questioned M.N. about the attack and recorded her description. Nurse Redolfo read M.N.'s description of the attack to the jury. In addition, Nurse Redolfo testified that M.N. suffered a tear near the rectum and abrasions on the interior of the vaginal wall and inside the labia minora. Additionally, M.N. suffered bruising on her face and on her inner left thigh, and she was bleeding from a scab that had broken free during the attack. After ascertaining the extent of M.N.'s injuries, Nurse Redolfo also testified that she discovered the presence of semen on a pair of pantyhose that M.N. had purportedly been wearing at the time of the attack. Moreover, Nurse Redolfo collected blood samples from M.N.'s vaginal vault and drew a vial of M.N.'s blood for further analysis. All of this evidence was turned over to the police and subsequently to the Tennessee Bureau of Investigation ("TBI") as part of the investigation.

Approximately three months after the police arrested Mr. Ellington, the investigators determined that Mr. Ellington's DNA profile did not match the DNA profile derived from the semen found on the pantyhose. Consequently, the police released Mr. Ellington and the unknown DNA profile derived from the semen was uploaded into the TBI's Combined DNA Index System ("CODIS"), which is a DNA database. Eighteen months later, Defendant was convicted of felony theft, and pursuant to Tennessee Code Annotated section 40-35-321(c) (2003), a sample of his blood was drawn and his DNA profile was uploaded into CODIS. Shortly thereafter on May 11, 2002, CODIS reported a match between Defendant and the unknown DNA profile from the semen found on the pantyhose. After additional blood samples verified the CODIS match, a Hamilton County Grand Jury indicted Defendant for the aggravated rape of M.N. pursuant to Tennessee Code Annotated section 39-13-502 (2003).

Detective Dudley and an officer from the Hamilton County Sheriff's Office's fugitive division traveled to Brushy Mountain Penitentiary to take custody of Defendant. When Detective Dudley advised Defendant of the charges and of his Miranda rights, Defendant appeared "puzzled" and did not seem to understand fully the seriousness of the charges against him, responding "I don't remember doing that. How much time will I get?" Detective Dudley did not question Defendant further.

Although the eighty-six-year-old M.N. was in the courtroom throughout the trial and was introduced to the jury during voir dire, the State did not call her to testify. When the State concluded its case-in-chief without calling M.N., Defendant moved for a judgment of acquittal, arguing that under Crawford v. Washington, 541 U.S. 36 (2004), the State had violated Defendant's right to confrontation by failing to call M.N. as a witness. The trial court inquired if the defense counsel would like to call M.N. to testify. The defense counsel responded that she would call M.N. to testify. However, Assistant District Attorney General Mary Sullivan Moore ("ADA Moore") stated that M.N. was suffering from dementia and Alzheimer's disease and was therefore unavailable to testify. The defense counsel argued that this was the first time that the State had disclosed M.N.'s mental

condition even though the trial court had inquired previously whether the State planned to call M.N. to testify. ADA Moore replied that she did not have to disclose M.N.'s mental condition.

The trial court chose not to address the issue of whether M.N. was unavailable and instead concluded that the inherent reliability of the hearsay exceptions argued by the State permitted the introduction of M.N.'s statements into evidence.[3] Consequently, the trial court denied Defendant's motion for judgment of acquittal. Defendant elected not to present any proof and the case was submitted to the jury, which found Defendant guilty of the charge of aggravated rape.

As a result of the decision in Blakely v. Washington, 542 U.S. 296 (2004), issued after the jury convicted Defendant but before the initial sentencing hearing on July 12, 2004, the trial court delayed imposition of a final sentence for one month to allow the parties to research and to brief the impact, if any, of Blakely on Tennessee's sentencing procedure. Ultimately, on August 16, 2004, the trial court imposed the presumptive sentence for Class A felonies — thirty-two years and six months. See Tenn. Code Ann. § 40-35-210(c) (2003).

On appeal to the Court of Criminal Appeals, Defendant argued that the trial court erred by: 1) denying his motion to suppress the identification of his DNA profile from CODIS; 2) admitting the pantyhose into evidence where the State failed to establish a proper chain of custody; 3) holding the evidence to be sufficient to sustain his conviction; 4) violating his right to confront M.N. at trial; 5) denying his motion to recuse; and 6) imposing an excessive sentence under an unconstitutional procedure. The Court of Criminal Appeals held that the trial court did not err by denying Defendant's motion to suppress and motion to recuse. Likewise, the Court of Criminal Appeals agreed with the trial court that the State had established a proper chain of custody for admission of the pantyhose and the DNA profile obtained from the pantyhose. While the intermediate appellate court held that the trial court erred by allowing two police officers to testify about M.N.'s statements concerning the attack, the Court of Criminal Appeals concluded that the error was harmless. Finally, the intermediate appellate court ruled that the trial court committed reversible error in sentencing Defendant and remanded the case for a new sentencing hearing.

We granted Defendant permission to appeal. For the reasons stated herein, we affirm the trial court's denial of Defendant's motion to suppress the identification of his DNA profile in light of our opinion in State v. Scarborough, 201 S.W.3d 607 (Tenn. 2006). We also conclude that the trial judge did not err in failing to recuse herself. However, we hold that the State failed to establish a proper chain of custody for the pantyhose and that Defendant's right to confrontation was violated. Furthermore, we disagree with the Court of Criminal Appeal's holding that the trial court's error in allowing Officer Norwood and Detective Dudley to testify about M.N.'s statements about the attack was harmless beyond a reasonable doubt. Therefore, we reverse Defendant's conviction and remand

---

[3] The State argued that M.N.'s statements to Officer Norwood and Detective Dudley were admissible under the "excited utterance" exception to the hearsay rule, see Tenn. R. Evid. 803(2), and that M.N.'s statements in her medical records and to Nurse Redolfo were admissible as statements made for the purpose of medical diagnosis and treatment and under the business record exception, see Tenn. R. Evid. 803(4), (6).

for a new trial. In light of our decision to reverse on other grounds, Defendant's challenges to the sufficiency of the evidence and sentencing are pretermitted.

## II. Analysis

*A. Chain of Custody*

First, we address whether the State properly established a chain of custody for the pantyhose purportedly belonging to M.N. We review challenges to the chain of custody of evidence under the abuse of discretion standard. State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Prior to trial, Defendant filed a motion to suppress the identification of his DNA profile from CODIS and a motion *in limine* challenging the chain of custody of the pantyhose. The trial court denied the motion to suppress. After hearing testimony from forensic experts from the TBI and Orchid Cellmark, which is an independent laboratory hired to analyze DNA samples for the TBI, the trial court was satisfied the "evidence was preserved properly while in their custody." However, the trial court reserved judgment on whether a proper chain of custody had been established for the handling of the pantyhose before the CPD investigators sent them to the TBI's laboratory in Nashville.[4]

Defendant argues that the pantyhose were not properly authenticated pursuant to Tennessee Rule of Evidence 901(a) because the State failed to establish a sufficient chain of custody. At trial, the State's only proof linking Defendant to M.N. was the DNA profile obtained from the semen found on the pantyhose. The State counters that the testimony of Detective Dudley, Nurse Redolfo, and Dr. Ingalls was sufficient to show that the pantyhose came from M.N.'s treatment room although "there was no specific testimony regarding the removal of the pantyhose from the victim."

Tennessee Rule of Evidence 901(a) provides: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." As we have previously recognized, it is "'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" Scott, 33 S.W.3d at 760 (quoting State v. Holbrooks, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). This evidentiary rule is designed to insure "that there has been no

---

[4] In this Court, Defendant challenges only the initial "link" in the pantyhose's chain of custody, i.e., whether the State established that the pantyhose belonged to and were worn by M.N. While defense counsel vigorously cross-examined the trial witnesses concerning various aspects of the DNA testing and laboratory protocols, we need not and do not delve into the details of this testimony. Our focus is confined to the proof relevant to the initial "link."

tampering, loss, substitution, or mistake with respect to the evidence." Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Professor Neil Cohen and his colleagues have aptly summarized the rule:

> The concept of a "chain" of custody recognizes that real evidence may be handled by more than one person between the time it is obtained and the time it is either introduced into evidence or subjected to scientific analysis. Obviously, any of these persons might have the opportunity to tamper with, confuse, misplace, damage, substitute, lose and replace, or otherwise alter the evidence or to observe another doing so. Each person who has custody or control of the evidence during this time is a "link" in the chain of custody. In theory at least, testimony from each link is needed to verify the authenticity of the evidence and to show that it is what it purports to be. Each link in the chain testifies about when, where, and how possession or control of the evidence was obtained; its condition upon receipt; where the item was kept; how it was safeguarded, if at all; any changes in its condition during possession; and when, where and how it left the witness's possession.

Neil P. Cohen et al., Tennessee Law of Evidence § 9.01[13][c] (5th ed. 2005) (footnotes omitted). Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. Scott, 33 S.W.3d at 760. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. See State v. Johnson, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." Scott, 33 S.W.3d at 760 (quoting Cohen et. al., Tennessee Law of Evidence § 901.12, at 624 (3d ed. 1995)).

On appeal, Defendant points out that M.N. had already removed her clothing and changed into a hospital gown when the State's witnesses arrived at the hospital to examine and to interview her. Furthermore, the State did not call any witnesses at Defendant's trial who could definitively testify that the pantyhose belonged to M.N. Nurse Redolfo was the first witness to testify specifically about the pantyhose, and the State attempted to have her authenticate the pantyhose as belonging to M.N. Nurse Redolfo stated that she knew the pantyhose belonged to M.N. because "[t]hey were there with her clothes and no one else had been in the room except her with the clothes. So I was told by several people they were her clothes." Defendant objected and the trial court sustained the objection. Immediately thereafter, Nurse Redolfo spontaneously stated in front of the

jury: "[M.N.] told me they were hers when I asked her." The trial court again sustained a defense objection to hearsay. The trial court did not permit the State to admit the pantyhose into evidence at that time through Nurse Redolfo.

The next witness was Dr. Brian Ingalls, the emergency room physician who treated M.N. In addition to discussing M.N.'s injuries and treatment, Dr. Ingalls testified about Memorial Hospital's emergency room protocol concerning the handling of a patient's clothing and personal effects. He stated that a patient's clothing is generally placed in a plastic bag and stored on a shelf in the treatment room. In cases of possible sexual assaults or rapes, medical personnel are trained to keep the clothing separated and secured in the plastic bag to preserve any potential evidence for investigators.

On cross-examination, Dr. Ingalls conceded that he did not know whether the protocol had been followed with respect to M.N. Moreover, he did not know what M.N. had been wearing when she was admitted to the hospital. He further acknowledged that the reports and information he reviewed prior to testifying did not contain any mention of pantyhose or underwear. Even though the parties had invoked the rule of sequestration prior to trial, Nurse Redolfo remained in the courtroom and heard Dr. Ingalls' testimony.

The State was allowed to recall Nurse Redolfo to testify, over Defendant's objection that she had improperly remained in the courtroom during Dr. Ingalls' testimony. Nurse Redolfo then testified that when she entered M.N.'s treatment room she had seen a plastic bag on the counter containing M.N.'s clothing. In addition, Nurse Redolfo testified that Detective Dudley entered the treatment room and spread the clothing out onto the counter so that she could photograph it. Nurse Redolfo said the pantyhose were in the plastic bag with the other clothing, that the pantyhose were wet in the bilateral groin area, and that this area of wetness on the pantyhose corresponded with the area of wetness on M.N.'s body about which M.N. had complained to Nurse Redolfo.

Testifying next for the State was Detective Dudley, who confirmed that M.N. had already disrobed when he arrived at the emergency room. Although Detective Dudley recalled opening the plastic bag and spreading the clothing on the counter prior to Nurse Redolfo's photograph, Detective Dudley could not specifically recall removing a pair of pantyhose from the plastic bag. Additionally, Detective Dudley specifically recalled M.N. using the word "underwear" in her statement rather than the word "pantyhose."

In determining whether the foregoing proof sufficiently established the chain of custody of the pantyhose, we are guided by our analogous Scott decision. In that case, the defendant was charged with rape and aggravated sexual battery. Scott, 33 S.W.3d at 748. During the course of the investigation, the police recovered from the body of the victim hairs that did not belong to the victim. Id. at 749. The victim was unable to identify her attacker in a lineup conducted eight days after the attack. Id. At trial, the State offered proof that the DNA profile from the hairs matched the defendant's DNA profile and established the defendant's identity as the perpetrator of the offense. Id. at 750. Although, the State offered proof to show that the two hairs collected from the victim

-7-

were sent from the TBI to the Federal Bureau of Investigation ("FBI") for analysis, the State failed to call "a witness with knowledge that the mounted hair samples [returned to the TBI from the FBI] were the same hairs as the ones originally taken from the victim" and sent from the TBI to the FBI. Id. at 761. In addition, the State failed to offer any "evidence whatsoever to show how the hairs came to be mounted on the slides" and also failed to offer "evidence to show who mounted the hairs on the slides or whether the hairs were mounted in a manner sufficiently free of contamination or alteration." Id. Without "this important 'link' in the chain [of custody]," we held that it was "impossible to know whether anyone tampered with the evidence, or whether anyone had the opportunity to 'confuse, misplace, damage, substitute, lose, [or] replace' the hairs at issue." Id. Accordingly, we concluded that the trial court erred in admitting the analysis of the hair samples because their identity and integrity had not been reasonably established. Id.

Applying the reasoning of Scott to the facts of this case, we agree with Defendant that the trial court erred by admitting into evidence the DNA analysis of semen found on the pantyhose because the pantyhose were not sufficiently identified as belonging to the victim by a witness with knowledge. While Nurse Redolfo testified that the pantyhose were in the plastic bag, photographic evidence does not support this assertion. The pantyhose do not appear in the photograph taken by Nurse Redolfo after Detective Dudley spread the clothes from the plastic bag onto the counter. Likewise, the pantyhose are not mentioned in either Nurse Redolfo's or Detective Dudley's report. Although Nurse Redolfo claimed that M.N. told her the pantyhose belonged to M.N., the trial court properly excluded this statement.

The suspect nature of the identification of the pantyhose is further compounded by the fact that Nurse Redolfo remained in the courtroom during Dr. Ingalls's testimony about the hospital's protocols for securing a patient's clothing. Nurse Redolfo did not mention retrieving the pantyhose from a plastic bag until after she improperly had remained in the courtroom and heard Dr. Ingalls' testimony concerning the protocols. We conclude that the State failed to establish a chain of custody sufficient to support the admission into evidence of the pantyhose and the DNA analysis of semen found on the pantyhose.[5] Thus, the trial court abused its discretion by admitting this evidence at trial.

We must next determine whether the error in admitting this evidence prejudiced Defendant. We apply a harmless error analysis to "virtually all evidentiary errors . . . ." State v. James, 81 S.W.3d 751, 763 (Tenn. 2002); see Tenn. R. Crim. P. 52(a) ("No conviction shall be reversed on appeal except for errors that affirmatively appear to have affected the result of the trial on the merits."); Tenn. R. App. P. 36(b) ("A final judgment from which relief is available and otherwise

---

[5] Contrary to the separate opinion's assertion, we do not require the State to establish an "absolute chain of custody." Nor are we mandating that the State produce every witness who had any contact with the pantyhose. Instead, we are requiring that the State introduce sufficient evidence to reasonably establish a connection between the pantyhose and M.N. It is paramount that the State establish the initial link in the chain of custody, because the DNA evidence derived from the pantyhose is the *only* tangible evidence that implicates Defendant as a suspect. Therefore, when this questionable evidence is coupled with the constitutional errors discussed in Section II(C), it becomes evident the State failed to establish a proper chain of custody.

-8-

appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process."). As this Court has previously stated:

> Whether error in the admission of evidence is prejudicial is gauged by the substance of the evidence, its relation to other evidence, and the peculiar facts and circumstances of the case, and whether such admission is sufficient ground for reversal depends on the facts in each case; and the appellate court will consider the record as a whole in determining the question of prejudice or reversibility.

Blankenship v. State, 410 S.W.2d 159, 161 (Tenn. 1966) (quoting 24B C.J.S. Criminal Law § 1915(2)).

In this case, the *only* tangible evidence linking Defendant in any way to M.N. was the DNA analysis derived from the semen found on the pantyhose. Neither M.N. nor anyone else identified Defendant as the assailant. Significantly both M.N. and her neighbors previously identified another person as the assailant. Given the critical nature of this evidence, we are unable to conclude that the error was harmless. Our holding does not preclude the State from attempting to establish a sufficient chain of custody for the introduction of this evidence at the new trial. After considering all of the circumstances in this case, we hold that the trial court abused its discretion in admitting the pantyhose into evidence and that this error was not harmless. As such, we reverse Defendant's conviction for aggravated rape and remand for a new trial.

*B. Motion to Suppress DNA Evidence*

Defendant next submits that the trial court erred by denying his motion to suppress and avers that the "warrantless, suspicionless taking of Defendant's blood, pursuant to Tenn. Code Ann. § 40-35-321, while in custody for an unrelated offense, violated his constitutional rights against search and seizures."

It is well established that when reviewing a trial court's denial of a motion to suppress, we will uphold the trial court's decision unless the evidence preponderates otherwise. Scarborough, 201 S.W.3d at 615; State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. We afford the prevailing party the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. Scarborough, 201 S.W.3d at 615 (citing State v. Carter, 16 S.W.3d 762, 765 (Tenn. 2000)). Therefore, the appellant bears the burden of demonstrating that the evidence preponderates against the trial court's ruling. State v. Harts, 7 S.W.3d 78, 84 (Tenn. Crim. App. 1999). However, we review the trial court's application of law to the facts de novo without a presumption of correctness. State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000).

Tennessee Code Annotated section 40-35-321(d)(1) (2003) ("DNA collection statute") provides:

> When a court sentences a person convicted of any felony offense committed on or after July 1, 1998, it shall order the person to provide a biological specimen for the purpose of DNA analysis as defined in subsection (a). . . . The biological specimen shall be forwarded by the approved agency or entity collecting such specimen to the Tennessee bureau of investigation which shall maintain it as provided in § 38-6-113. The court shall make the providing of such a specimen a condition of probation or community correction if either is granted.

In Scarborough, we addressed the constitutionality of a search employing DNA evidence collected under this statute that led to rape charges against an inmate, who was incarcerated on an unrelated charge. We held that blood drawn under the DNA collection statute and the subsequent analysis thereof are searches entitled to protection under the Fourth Amendment of the United States Constitution and article I, section 7 of the Tennessee Constitution. However, we also found that "searches of incarcerated felons undertaken pursuant to Tennessee's DNA collection statute pass constitutional muster when they are reasonable under all of the circumstances." Scarborough, 201 S.W.3d at 618.

Defendant's challenge to the DNA collection statute presents the same arguments raised and rejected in Scarborough; therefore, we affirm the decision of the trial court. During a suppression hearing held on March 29, 2004, the State introduced evidence that Defendant pled guilty and was convicted of attempted theft of property valued over $10,000, a felony, on December 8, 2000. That trial court ordered Defendant to provide a biological specimen for the purpose of DNA analysis. On August 13, 2001, Defendant submitted to a blood draw and signed a consent form[6] while imprisoned on the attempted theft charge. Defendant's blood sample was uploaded into CODIS on May 10, 2002. The next day, CODIS produced a report indicating a DNA match between Defendant and the DNA evidence collected from the pantyhose. Defendant was subsequently arrested and indicted for the aggravated rape of M.N.

The trial court held "that based on the way this blood was taken, all the circumstances, that this was not a violation of [the] Fourth Amendment or the equal protection clause or the due process clause of the United States Constitution or the Tennessee Constitution." The Court of Criminal Appeals relied on our decision in Scarborough and affirmed the trial court's decision. We affirm the intermediate appellate court's decision and hold that under the totality of the circumstances Defendant's blood draw and its subsequent analysis were reasonable. Therefore, Defendant is not entitled to relief on this issue.

---

[6] The consent form Defendant signed is nearly identical to the consent form signed in Scarborough. See Scarborough, 201 S.W.3d at 613.

*C. Confrontation Clause*

Defendant asserts that the State deprived him of his right to confrontation because he was unable to cross-examine M.N. Defendant argues that the State withheld information about M.N.'s mental state and ability to testify at trial so that it could introduce evidence that would otherwise have been inadmissible. The State, on the other hand, argues that "a confrontation clause issue only arises where a declarant's statements are introduced and the defendant is unable to cross-examine the declarant regarding those statements. The prosecution's decision not to call the victim to testify, in and of itself, did not violate the confrontation clause."

The Confrontation Clause of the Sixth Amendment commands: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The fundamental right of confrontation applies through the Fourteenth Amendment to the states. Pointer v. Texas, 380 U.S. 400, 403 (1965); see State v. Henderson, 554 S.W.2d 117, 119 (Tenn. 1977). Additionally, article I, section 9 of the Tennessee Constitution guarantees this right, providing "[t]hat in all criminal prosecutions, the accused hath the right to . . . meet the witnesses face to face . . . ." Tenn. Const. art. I, § 9. Although the language of the federal and state constitutional provisions is somewhat different, in determining the rights of an accused under article I, section 9, we have traditionally adopted and applied the standards enunciated by the United States Supreme Court. State v. Lewis, 235 S.W.3d 136, 144 (Tenn. 2007) (citing authorities).

For nearly a quarter of a century, the admissibility of out-of-court statements of an unavailable witness was governed by Ohio v. Roberts, 448 U.S. 56 (1980). However, in Crawford v. Washington, 541 U.S. 36 (2004), the Supreme Court abrogated Roberts and dramatically altered the Confrontation Clause landscape. The Court enunciated a new mode of analysis that focuses upon whether a statement is nontestimonial or testimonial. The Court explained:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.

Id. at 68. Although Crawford did not provide a comprehensive definition of "testimonial," it provided three core formulations of "testimonial" statements, including:

> [1] *ex parte* in-court testimony or its functional equivalent - that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in

formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Id. at 51-52 (citations omitted). Therefore, under Crawford, when an accused challenges the admissibility of a statement under the Confrontation Clause, the threshold question is whether the statement is testimonial or nontestimonial. See United States v. Hinton, 423 F.3d 355, 358 (3d Cir. 2005).

Much has been written to further refine Crawford's distinction between testimonial and nontestimonial statements. In State v. Maclin, this Court concluded that courts must employ a case-by-case approach and inquire whether the challenged statement was made "'under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" 183 S.W.3d 335, 349 (Tenn. 2006)(quoting Crawford, 541 U.S. at 52). Prior to the release of our opinion in Maclin, the United States Supreme Court had granted certiorari in Washington v. Davis, 111 P.3d 844 (Wash. 2005)(en banc), cert. granted, 126 S. Ct. 547 (2005); and Hammon v. State, 829 N.E.2d 444 (Ind. 2005), cert. granted, 126 S. Ct. 552 (2005), to expand on the testimonial/nontestimonial dichotomy. In this consolidated appeal, the United States Supreme Court abrogated our decision in Maclin by holding that:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

Davis v. Washington, 126 S. Ct. 2266, 2273-74 (2006). Both Davis and Hammon[7] concerned statements made by victims of domestic assault to the police or to persons viewed as agents of the police, e.g., 911 emergency operators. At issue in Davis were statements made by the victim to a 911 emergency operator, reporting that her former boyfriend was assaulting her. Id. at 2271. The

---

[7] In Hammon, the victim called police to report that her husband, the defendant, had assaulted her during an argument. Davis, 126 S. Ct. at 2272. The police officer investigating the call spoke with the victim and took her written statement describing how the defendant had assaulted her. Id. Over defense objection, the trial court allowed the investigating police officer to read the victim's statement into evidence because she had become unavailable prior to trial. Id. After a bench trial, the trial court convicted the defendant. Id. at 2273. The Davis Court found that the victim's statement was testimonial, holding that there was no ongoing emergency and when "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime - which is, of course, precisely what the officer *should* have done." Id. at 2278 (emphasis in original).

911 emergency operator asked a series of questions aimed at determining the nature of the complaint, whether the threat was ongoing, the identity of the assailant, and the location of the assailant. Id. The victim did not appear at trial, and over defense objection, the trial court allowed the prosecution to play an audio recording of the victim's 911 emergency call. Id. A jury convicted Davis. Id.

The primary purpose test adopted in Davis requires courts to examine the context in which a statement is given. The Davis Court recognized that the nature of police interrogations may change as they are conducted.[8] The Court noted that the victim in Davis "was speaking about events *as they were actually happening* rather than 'describ[ing] past events[.]'" Id. at 2276 (emphasis in original). The Court held that the Davis victim's "interrogation objectively indicate[d] its primary purpose was to enable police assistance to meet an ongoing emergency." Id. at 2277. Since the statements were made to obtain police assistance in an ongoing emergency, the Court held the statements were nontestimonial. Id.

After Davis, we again addressed the testimonial/nontestimonial dichotomy in Lewis. In Lewis, we recognized the Supreme Court's further departure from Roberts and acknowledged that the primary purpose test enunciated in Davis governs confrontation clause analysis. Lewis, 235 S.W.3d at 145. To summarize then, under both the United States and the Tennessee Constitutions, the appropriate analysis for determining whether an out-of-court statement may be admitted into evidence without violating an accused's right of confrontation is as follows. A court must first determine whether the statement is testimonial or nontestimonial. Statements are testimonial if the primary purpose of the statement is to establish or to prove past events potentially relevant to later criminal prosecutions. A testimonial statement is inadmissible unless the State can establish that: "'(1) the declarant is unavailable and (2) the accused had a prior opportunity to cross-examine the declarant.'" Id. at 143 (quoting Maclin, 183 S.W.3d at 345). If the statement is nontestimonial, the Confrontation Clause does not apply, and the statement must be analyzed under the "traditional limitations upon hearsay evidence." Davis, 126 S. Ct. at 2273; see also Lewis, 235 S.W.3d at 145 (holding that "[i]t is our view, therefore, that a Roberts analysis for nontestimonial evidence is not necessary to satisfy the state constitution's 'face-to-face' requirement and Crawford and its progeny establish appropriate guidelines").

*1. Testimonial or NonTestimonial – Medical Records[9]*

Applying the foregoing analysis to determine whether M.N.'s medical records were properly admitted, we must first ask whether M.N.'s out-of-court statements to emergency room medical personnel that she had been raped were testimonial or nontestimonial. In resolving this issue, we

---

[8] The Court noted that "[t]his is not to say that a conversation which begins as an interrogation to determine the need for emergency assistance cannot, as the Indiana Supreme Court put it, 'evolve into testimonial statements,' 829 N.E.2d, at 457, once that purpose has been achieved." Davis, 126 S. Ct. at 2277.

[9] We note, as did the Court of Criminal Appeals, that Defendant risked waiving this issue by not objecting at trial. See Tenn. R. App. P. 36(a). However, since a new trial is necessary and for future guidance, we will address this issue on the merits.

look first to Crawford itself, which cited business records and statements in furtherance of a conspiracy as examples of nontestimonial statements. Crawford, 541 U.S. at 56. Furthermore, Chief Justice Rehnquist emphasized in his concurring opinion that the examples of testimonial hearsay cited by the majority in Crawford "exclude[d] at least some hearsay exceptions, such as business records and official records." Crawford, 541 U.S. at 76 (Rehnquist, C.J., concurring). Thus, to the extent medical records may be properly categorized as business records, such records are properly categorized as nontestimonial.

Additionally, statements in medical records given for the primary purpose of medical diagnosis and treatment are nontestimonial. See United States v. Ellis, 460 F.3d 920, 924-27 (7th Cir. 2006) (finding that medical records are nontestimonial); People v. Vigil, 127 P.3d 916, 923-24 (Colo. 2006)(en banc) (holding that a victim's statements to a physician performing a sexual assault examination were nontestimonial where police were not involved and the primary purpose of the statements were for medical treatment); State v. Hooper, No. 33826, 2007 WL 4472263, at *6 (Idaho Dec. 24, 2007) (noting that statements to medical personnel for treatment are nontestimonial); accord State v. Krasky, 736 N.W.2d 636, 641 (Minn. 2007); Commonwealth v. DeOliveira, 849 N.E.2d 218, 220 (Mass. 2006); Richardson v. State, 856 N.E.2d 1222, 1230 (Ind. Ct. App. 2006) (finding medical records were business records and therefore nontestimonial).

We conclude therefore that M.N's medical records containing her out-of-court statements to emergency room medical personnel that she had been raped were nontestimonial and properly admitted under Tennessee Rule of Evidence 803(4) (providing that "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment[]" are admissible under the hearsay rule). M.N. sought medical treatment at the emergency room after she was attacked in her home. Her statements to the nurses and the treating physician in the emergency room were objectively for the primary purpose of seeking medical diagnosis and treatment for injuries sustained in the attack.[10] Accordingly, M.N.'s statements to the emergency room medical personnel were nontestimonial, and the admissibility of these medical records at the new trial will be governed by the rules of evidence.

*2. Statements to Officer Norwood, Detective Dudley, and Nurse Redolfo*

We next determine whether M.N.'s statements to Officer Norwood, Detective Dudley, and Nurse Redolfo were testimonial or nontestimonial. Officer Norwood was the first police officer to respond to M.N.'s 911 call. When Officer Norwood spoke to M.N., there was no longer an ongoing emergency. To an objective person, the primary purpose of M.N.'s statements to Officer Norwood were to describe and to establish a past crime. As the Court of Criminal Appeals aptly reasoned, M.N.'s statements "were neither a cry for help nor the provision of information enabling officers

---

[10] M.N.'s later statements to Nurse Redolfo and to Detective Dudley, which were given after she had been stabilized by the emergency room medical personnel, will be discussed hereinafter.

-14-

immediately to end a threatening situation." Thus, M.N.'s statements to Officer Norwood were testimonial.

Similarly, M.N.'s statements to Detective Dudley at the emergency room were testimonial. Detective Dudley's interrogation occurred after emergency room medical personnel had examined and stabilized M.N. Detective Dudley interrogated M.N. as part of his investigation of the reported rape. His aim in the interrogation was to determine whether a crime had occurred and to ascertain the identity of the assailant. The purpose of M.N.'s statements was to report a past criminal act, and her statements to Detective Dudley thus were testimonial.

Finally, we turn to the issue of whether M.N.'s statements to Nurse Redolfo were testimonial or nontestimonial. The proper classification of out-of-court statements to persons other than law enforcement personnel is an issue of first impression for this Court. The Davis Court left this issue unresolved, explaining "our holding today makes it unnecessary to consider whether and when statements made to someone other than law enforcement personnel are 'testimonial.'" Davis, 126 S. Ct. at 2274 n.2. However, the Davis Court treated 911 emergency operators as agents of the police for purposes of that opinion, even though it recognized that the operators were not themselves police officers. Id.

The State argues that M.N.'s statements to Nurse Redolfo "were nontestimonial in nature and thus properly admitted pursuant to the medical diagnosis exception to the hearsay rule." See Tenn. R. Evid. 803(4). The intermediate appellate court held that since M.N. had been discussing her injuries with emergency room medical personnel prior to speaking with Nurse Redolfo, the statements were nontestimonial and thus admissible pursuant to Tennessee Rule of Evidence 803(4). We disagree.

M.N.'s statements to Nurse Redolfo were not "reasonably pertinent to diagnosis and treatment." Id. Emergency room medical personnel had examined and stabilized M.N. before she spoke with Nurse Redolfo. Furthermore, Detective Dudley testified that the medical needs of a victim take priority over the pursuit of a criminal investigation, including whether a sexual assault nurse examiner interviews or examines the victim. We conclude that the victim's statements to Nurse Redolfo were testimonial as the primary purpose of these statements was "to establish or prove past events potentially relevant to later criminal prosecution." Davis, 126 S. Ct. at 2274. The following facts support our conclusion.

The policy of both the CPD and of the hospital is to have a sexual assault nurse examiner speak with victims of sexually-related crimes. Nurse Redolfo testified that she had been trained to question suspected rape victims and that she had been instructed by speakers from law enforcement agencies and from the district attorney's office on how to collect evidence and how to ask questions. Nurse Redolfo often testifies at trials in her capacity as a sexual assault nurse examiner. When she spoke to M.N., Nurse Redolfo introduced herself and explained her role. Nurse Redolfo performed a structured examination and interview of the victim, which Nurse Redolfo described as an

"investigation" designed to gain information about the rape. Additionally, Nurse Redolfo described the physical examination she performed as a forensic examination. Detective Dudley questioned M.N. along with Nurse Redolfo. M.N. had already been examined by a nurse and the emergency room physician before Nurse Redolfo interviewed her, so there was no ongoing emergency. As stated, the primary purpose of the interrogation was "to establish or prove past events potentially relevant to later criminal prosecution." Davis, 126 S. Ct. at 2274. As such, we hold that M.N.'s statements to Nurse Redolfo were testimonial.

We caution, however, that our conclusion in this case should not be interpreted as a blanket rule characterizing as testimonial all the portions of all out-of-court statements given by sexual assault victims to sexual assault nurse examiners. As the Supreme Court in Davis recognized, statements may evolve from nontestimonial to testimonial. Davis, 126 S. Ct. at 2277. The Davis victim's statements to the 911 operator evolved from nontestimonial to testimonial at the point when the assailant drove away from the scene and the ongoing emergency ended. The subsequent continued questioning by the 911 emergency operator became analogous to a "structured police interrogation," making the victim's responses testimonial. Id. Similarly, statements to sexual assault nurse examiners may evolve from nontestimonial to testimonial. As the United States Supreme Court noted in Davis, a court deciding the admissibility of out-of-court statements should utilize *in limine* procedures and redaction to balance appropriately an accused's right of confrontation against the prosecution's right to present admissible evidence. Id. (noting that "[t]hrough *in limine* procedure, [trial courts] should redact or exclude the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence"); see also State v. Romero, 156 P.3d 694, 699 (N.M. 2006) (holding that the testimonial portion of an unavailable witness's statement to a sexual assault nurse examiner should have been excluded).

*3. Unavailability and Prior Opportunity for Cross- Examination*

Because M.N.'s statements to Officer Norwood, Detective Dudley, and Nurse Redolfo were testimonial, the state and federal constitutions permitted the introduction of these statements only if M.N. was unavailable at trial and Defendant had a prior opportunity to cross-examine her. Lewis, 235 S.W.3d at 142 (citing Crawford, 541 U.S. at 68). The record before us establishes neither of these prerequisites for admissibility. The trial court, and apparently the defense counsel, accepted ADA Moore's unsubstantiated assertion that M.N. was unavailable to testify because of dementia and Alzheimer's disease. However, the State offered no proof to establish unavailability, such as testimony concerning M.N.'s mental condition from either a physician or a relative.[11] Although we resolve this appeal on other grounds, we emphasize that unavailability must be supported by proof, not by unsupported statements of counsel. See United States v. Cabrera-Frattini, 65 M.J. 241, 247-48 (C.A.A.F. 2007) (noting that a physician's testimony describing the declarant's mental condition

---

[11] We note that M.N.'s son-in-law testified at Defendant's subsequent sentencing hearing about M.N.'s dementia and Alzheimer's disease diagnosis. However, this information was not before the trial court during the motion for judgment of acquittal.

was sufficient to establish the declarant's unavailability).  Furthermore, as previously indicated, pre-trial *in limine* procedures should be utilized to resolve issues relating to the admissibility of out-of-court statements, such as whether the witness making the out-of-court statement truly is unavailable to testify.  Had these pre-trial procedures been utilized in this case, this grave constitutional issue could have been resolved before trial.[12]

In this case, however, the question of M.N.'s unavailability is not dispositive because the record clearly reveals that Defendant had no prior opportunity to cross-examine M.N.  See Lewis 235 S.W.3d at 147 (explaining that, if testimonial statements are to be admitted, "the rule in Crawford . . . not only requires the unavailability of the declarant, . . . but [also] the opportunity for cross-examination"); United States v. Yida, 498 F.3d 945, 950 (9th Cir. 2007) (noting that "[t]he constitutional requirement that a witness be 'unavailable' before his prior testimony is admissible stands on separate footing that is independent of and in addition to the requirement of a prior opportunity for cross-examination").  Thus, admission of M.N.'s out-of-court statements to Officer Norwood, Detective Dudley, and Nurse Redolfo violated Defendant's right of confrontation.

*4. Harmless Error Analysis*

The erroneous admission of testimony in violation of an accused's right of confrontation is not structural error mandating reversal.  Such a violation is subject to harmless error review.  Coy v. Iowa, 487 U.S. 1012, 1021 (1988); State v. Gomez, 163 S.W.3d 632, 647 (Tenn. 2005), vacated on other grounds by Gomez v. Tennessee, 127 S. Ct. 1209 (2007).  A constitutional error is harmless if the State proves beyond a reasonable doubt that the error did not affect the verdict at trial. Chapman v. California, 386 U.S. 18, 24 (1967); Cottingham v. Cottingham, 193 S.W.3d 531, 536 (Tenn. 2006).  "An assessment of harmlessness cannot include consideration of whether the witness' testimony would have been unchanged, or the jury's assessment unaltered, had there been confrontation; such an inquiry would obviously involve pure speculation, and harmlessness must therefore be determined on the basis of the remaining evidence."  Coy, 487 U.S. at 1021-22.

Having previously determined that Defendant is entitled to a new trial based upon the State's failure to establish a sufficient chain of custody, we need not determine whether the erroneous admission of evidence in violation of Defendant's right of confrontation was harmful in and of itself. Suffice it to say that testimonial out-of-court statements should be admitted at the new trial only if the prosecution establishes both the witness's unavailability and Defendant's prior opportunity to cross-examine the witness.

*E. Appearance of Impropriety*

---

[12]  Although we recognize that Davis v. Washington had not been decided at the time this case was tried, there were clearly Confrontation Clause issues apparent in this case following the United States Supreme Court decision in Crawford v. Washington.

Defendant next maintains that a friendship between the trial judge and ADA Moore, one of the Assistant District Attorneys General prosecuting the case, created a serious appearance of impropriety that warranted the recusal of the trial judge. Defendant asserts that the friendship between the trial judge and ADA Moore, which included their participation in a group overseas vacation, frequent visits to the trial judge's home by ADA Moore, and ADA Moore's admission that she and the trial judge are "close friends," mandates recusal under the Code of Judicial Conduct. As evidence of the trial court's bias, Defendant points out that the trial court failed to reprimand ADA Moore for failing to disclose M.N.'s mental condition and unavailability and argues that the trial court rendered questionable rulings that were unfairly favorable to the State.

Whether a judge should recuse herself or himself from a legal proceeding rests within the sound discretion of the judge. State v. Reid, 213 S.W.3d 792, 815 (Tenn. 2006); Davis v. Liberty Mut. Ins. Co., 38 S.W.3d 560, 564 (Tenn. 2001). A judge's decision will not be reversed on appeal "unless clear abuse appears on the face of the record." Reid, 213 S.W.3d at 815; see also State v. Hines, 919 S.W.2d 573, 578 (Tenn. 1995). However, if a judge has any doubt concerning his or her ability to preside over a case impartially or neutrally, recusal is warranted. See Liberty Mut. Ins. Co., 38 S.W.3d at 564. In addition, recusal is proper "'when a person of ordinary prudence in the judge's position, knowing all of the facts known to the judge, would find a reasonable basis for questioning the judge's impartiality.'" Id. (quoting Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994)). Therefore, the test for recusal is an objective one because the appearance of bias is just as injurious to the integrity of the courts as actual bias. See Liberty Mut. Ins. Co., 38 S.W.3d at 565. "'The right to a fair trial before an impartial tribunal is a fundamental constitutional right.'" Reid, 213 S.W.3d at 815 (quoting State v. Austin, 87 S.W.3d 447, 470 (Tenn. 2002)); see Wilson v. Wilson, 987 S.W.2d 555, 562 (Tenn. Ct. App. 1998) (noting that it "goes without saying that a trial before a biased or prejudicial fact finder is a denial of due process"). If the public is to maintain confidence in our system of justice, a litigant must be afforded to the "'cold neutrality of an impartial court.'" Liberty Mut. Ins. Co., 38 S.W.3d at 564 (quoting Kinard v. Kinard, 986 S.W.2d 220, 227 (Tenn. Ct. App. 1998)).

Canon 2 of the Code of Judicial Conduct provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Tenn. Sup. Ct. R. 10, Canon 2(A). Likewise, Canon 3 requires: "A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where: (a) the judge has a personal bias or prejudice concerning a party or a party's lawyer . . ." Tenn. Sup. Ct. R. 10, Canon 3(E)(1).

The record before us does not reveal on its face that the trial judge clearly abused her discretion in denying Defendant's motion to recuse. There is little evidence contained in the record describing the extent of the trial judge's and ADA Moore's friendship. Even though the trial judge and ADA Moore traveled with a group on an overseas vacation, it appears ADA Moore and the trial judge were together very little during the trip. The mere existence of a friendship between a judge and an attorney is not sufficient, standing alone, to mandate recusal.

In <u>United States v. Murphy</u>, 768 F.2d 1518, 1537 (7th Cir. 1985), the Court of Appeals for the Seventh Circuit stated:

> In today's legal culture friendships among judges and lawyers are common. They are more than common; they are desirable. A judge need not cut himself off from the rest of the legal community. Social as well as official communications among judges and lawyers may improve the quality of legal decisions. Social interactions also make service to the bench, quite isolated as a rule, more tolerable to judges. Many well-qualified people would hesitate to become judges if they knew that wearing the robe meant either discharging one's friends or risking disqualification in substantial numbers of cases.

<u>See also</u> <u>In re Hutter</u>, 221 B.R. 632, 640 (Bankr. D. Conn. 1998) (noting that "[a] judge is neither required nor encouraged to forego social interaction and involvement upon assuming his or her office"); <u>Hadler v. Union Bank & Trust Co.</u>, 765 F. Supp. 976, 977 (S.D. Ind. 1991) (reasoning that the judicial oath of office "would provide little solace to the thousands of litigants who daily seek redress of their legal claims in federal court were it supposed that judges would regularly be unable to set aside personal friendships in order to uphold the law"). The Code of Judicial Conduct does not require judges to remain isolated from other members of the bar and from the community.

We further hold that Defendant is not entitled to relief based upon his argument that the trial judge's rulings were unfairly favorable to the State and demonstrated bias against him. A trial judge's adverse rulings are not usually sufficient to establish bias. <u>Alley</u>, 882 S.W.2d at 821. Indeed, "[r]ulings of a trial judge, even if erroneous, numerous and continuous, do not, without more, justify disqualification." <u>Id.</u> Even though we hold that the trial court committed reversible evidentiary errors with regard to the chain of custody of the pantyhose and the admissibility of M.N.'s out-of-court statements, the record does not support the proposition that those decisions resulted from the trial judge's bias or prejudice against Defendant. Accordingly, we hold that Defendant is not entitled to relief on this issue.

*F. Sufficiency of the Evidence and Sentencing*

Because of our decision to reverse Defendant's conviction and remand for a new trial on other grounds, these issues are pretermitted. However, with respect to sentencing, we note that in light of <u>Cunningham v. California</u>, 127 S. Ct. 856 (2007), the United States Supreme Court's order to vacate our decision in <u>State v. Gomez</u>, 163 S.W.3d 632 (Tenn. 2005), <u>vacated by</u> <u>Gomez v. Tennessee</u>, 127 S. Ct. 1209 (2007), and our recent decision in <u>State v. Gomez</u>, 239 S.W.3d 733 (Tenn. 2007), the trial court's imposition of the presumptive minimum sentence was appropriate.

IV. Conclusion

In sum, we hold that the State failed to establish a proper and sufficient chain of custody for admission of the pantyhose and the DNA analysis of the semen found on the pantyhose. Because we conclude that this error was not harmless, we reverse Defendant's conviction for aggravated rape and remand for a new trial on the charge. We further hold that M.N.'s out-of-court statements to Officer Norwood, Detective Dudley, and Nurse Redolfo were testimonial and that the admission of testimony concerning these statements violated Defendant's right of confrontation because the record does not reflect that Defendant had a prior opportunity to cross-examine the victim. Nonetheless, we affirm the Court of Criminal Appeal's conclusions that the trial court did not err in denying Defendant's motion to suppress evidence, in denying Defendant's motion to recuse, and in admitting the medical records containing M.N.'s out-of-court nontestimonial statements.

Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
WILLIAM M. BARKER, CHIEF JUSTICE