IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 24, 2018 Session

## STATE OF TENNESSEE v. JOHN PALLADIN GIBSON

**Appeal from the Criminal Court for Knox County
No. 105492   Steven W. Sword, Judge**

_____

## No. E2017-01567-CCA-R3-CD
_____

TIMOTHY L. EASTER, J., concurring in part and dissenting in part.

I agree with the majority's conclusion to affirm Defendant's conviction for driving on a cancelled, suspended, or revoked license. Additionally, I agree with the majority's conclusion on the ineffective assistance of counsel claim. However, I respectfully disagree with the majority's conclusion to reverse both DUI convictions. I am of the opinion that the trial court did not abuse its discretion by admitting the blood-sample evidence because there was sufficient authentication to establish a chain of custody. Therefore, I would affirm the decision of the trial court regarding both DUI convictions. Further, even if the trial court erred in admitting the blood-sample evidence, it was harmless error with regard to the DUI by impairment conviction. A rational jury could have grounded its verdict on both Deputy Sulewski's testimony and the dashboard video showing Defendant's speech and performance on three field-sobriety tests. Therefore, I would affirm the conviction for DUI by impairment on that basis as well.

The majority correctly sets forth the State's burden in proving the chain of custody for tangible evidence. The State is required to "reasonably establish the identity and integrity of the evidence"; however, "this rule does not require that the identity . . . be proven beyond the possibility of all doubt[.]" *State v. Cannon*, 254 S.W.3d 287, 296 (Tenn. 2008) (citing *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000)). At trial, the State is not required to call all of the witnesses who handled the evidence, and the State does not have to eliminate all possibility of tampering to properly authenticate the evidence. *See id.* "The purpose of the chain of custody requirement is 'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Scott*, 33 S.W.3d at 760 (citing *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

The majority relies on this Court's opinion in *State v. Reginald Coffee*, which held the chain of custody was not properly established when an envelope containing fingerprint evidence could not be accounted for during an almost twenty-four hour period. No. M2016-01834-CCA-R3-CD, 2017 WL 3836023, at *14 (Tenn. Crim. App. Aug. 31, 2017), *perm. app. denied* (Tenn. Jan. 17, 2018). "[N]o proof was presented of what was done with the envelope" between the time the fingerprints were collected and the time the envelope was opened for testing, although it was clear the seal on the envelope had been broken. *Id.* In *Reginald Coffee*, a detective who did not personally collect the fingerprints testified to the general procedure for collecting fingerprint evidence and placing the evidence in a secured locker. *Id.* at *5. The forensic scientist who received the fingerprints "did not testify about the condition of the envelope when she received it, whether it was properly sealed, or the latent fingerprint division's standard procedure for storing and testing fingerprint evidence." *Id.* at *14. Evidence showed "the envelope was split open on one side, showed multiple sets of initials, and the [fingerprint] cards inside were initialed by [the forensic scientist] and another person, whose initials were illegible." *Id.* This Court reasoned "the absence of testimony about standard procedures for handling, storing, and transporting fingerprint evidence makes it 'impossible to know whether anyone tampered with the evidence, or whether anyone had the opportunity to confuse, misplace, damage, substitute, lose, [or] replace'" the evidence. *Id.* at *15 (quoting *Scott*, 33 S.W.3d at 761 (internal quotations omitted)). The reasoning in *Reginald Coffee* seems to rely on both the absence of testimony regarding standard procedures *and* the fact that the evidence envelope had clearly been unsealed and initialed by individuals who could not be identified and did not testify at trial.

The majority concludes that because there was no testimony to show the location of and the condition in which the evidence was kept between Deputy Sulewski's delivering it to an unidentified person from the Forensics Department and the TBI Laboratory receipt of it from the Sheriff's Department, the State did not establish a sufficient chain of custody. The majority infers the set of chain of evidence facts are indistinguishable from *Reginald Coffee*. However, the evidence in *Reginald Coffee* shows the envelope containing the fingerprints had been unsealed multiple times before reaching the scientist for testing, and no proof was offered to show what happened during those times. Further, the actual fingerprint card inside the evidence bag had initials on it that the testifying witness could not identify. These are important gaps in the chain of evidence that are not present in Defendant's case. This Court had good reason to question the gap in the chain of custody in *Reginald Coffee* because it was clear the evidence had been unsealed and disturbed before being tested, and there was no evidence to establish that the integrity of the sample was maintained during that period. We do not have the same integrity issue in Defendant's case.

Here, Deputy Sulewski described the procedures he followed when collecting Defendant's blood. Deputy Sulewski retrieved the TBI blood-kit from his vehicle, took the two test tubes out of the kit, and watched the hospital technician draw Defendant's

2

blood. Next, Deputy Sulweski placed the sealed tubes into the blood-kit box, filled out a form with Defendant's and Deputy Sulewski's personal information, and sealed the blood-kit box with the form inside. Deputy Sulewski hand delivered the evidence to an officer with the forensics department and testified, "they bring it to the TBI, I guess." After evidence is delivered to the forensics department, Deputy Sulewski testified, it is out of his control.

After Deputy Sulewski testified, Agent Dotson, with the TBI, detailed what happened to the blood kit once it was dropped off at the TBI. Speaking about blood-kit evidence generally, Agent Dotson testified that officers place the blood-kit box in a blue, mailbox-like container in the TBI's secured lobby. The officer who drops off the blood kit signs a log book each time he or she leaves evidence with the TBI. Once the box is in container, the officer cannot retrieve it; only personnel from the TBI have access. A TBI technician clears out the container at the end of each day. When the technician removes the blood kit, the technician opens the box to ensure the forms and identifying information match the actual blood-sample test tubes. The blood samples are then stored in a secured vault until the technician takes them out and delivers them to the agent for testing. If there are any contamination concerns, or if the blood is coagulated, Agent Dotson testified that she makes a notation on her file. There were no such notations in Defendant's case.

Here, Agent Dotson verified that the box was sealed when it was received by the TBI and that the form inside matched Defendant's identifying information on the test tubes containing the blood sample. Agent Dotson did not physically inspect the sealed box herself but explained that was a crucial step Debra White, the initial technician who retrieved the blood sample, would have done when verifying that the form inside the kit matched the identifying information on the actual sample. Ms. White placed the blood samples in a secured vault until they were delivered to Agent Dotson for testing. Agent Dotson did not make any notations about the blood appearing to be coagulated or in any irregular state. No evidence was presented that the blood-sample evidence had been opened, only that the blood-kit had been verified by Debra White for Defendant's information. No evidence was presented that the integrity of the blood sample had been compromised. While the majority is correct there is no testimony regarding who dropped the Defendant's blood-kit off at the TBI, there is also no indication, unlike the envelope in *Reginald Coffee*, that the seal on the box or the seal on the blood-samples themselves was broken. The State was still able to sufficiently prove the identity and integrity of the sample, and the decision of the trial court to admit the blood-sample evidence was not an abuse of discretion.

The majority distinguishes three different cases as further consideration for finding the trial court in Defendant's case abused its discretion in admitting the blood-sample evidence. *See State v. Pascasio Martinez*, No. E2016-01491-CCA-R3-CD, 2017 WL 5613976 (Tenn. Crim. App. Nov. 21, 2019), *perm. app. denied* (Tenn. Mar 15, 2018);

*State v. Earnest Laning*, No. E2011-01882-CCA-R3-CD, 2012 WL 3158782 (Tenn. Crim. App. Aug. 6, 2012) *no perm. app. filed*; *State v. Michael Joseph Arbuckle*, No. M2000-02885-CCA-R3-CD, 2001 WL 1545494 (Tenn. Crim. App. Dec. 5, 2001), *perm. app. denied* (Tenn. May 28, 2002). It seems the only factual distinction between those cases and Defendant's case is that Deputy Sulewski did not place the sealed container in a locked storage device before it was delivered to the TBI.

Here, Deputy Sulewski hand delivered the sealed evidence box to the forensics department, who he understood was responsible for delivering the sample to the TBI laboratory. Agent Dotson was the next link in the chain of custody, and she testified that the seal on the evidence was intact and that a technician, Ms. White, verified that the information contained in the sealed box matched Defendant's information on the actual blood samples. Agent Dotson described the general procedure for intake, assignment, and security of samples once they enter the TBI laboratory. The samples are dropped off in a secured lobby, removed from the secured lobby at the end of the day, verified by matching the identifying information to the actual sample, and then stored in a secured vault until the sample is tested. Based on the testimony of Deputy Sulewksi and Agent Dotson, I do not find the trial court abused its discretion in admitting the blood-sample evidence.

Even if the State failed to adequately establish the chain of custody regarding the blood-sample evidence, and the DUI per se charge is reversed, the DUI by impairment conviction should be upheld because a rational jury could have grounded its verdict on witness testimony and video evidence. To support a conviction for DUI by impairment, the State is required to prove Defendant was "in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, . . . or while on the premises of any shopping center . . . while . . . [u]nder the influence of any intoxicant[.]" T.C.A. § 55-10-401(a)(1) (2015). Previously, this Court has held "that an arresting officer's testimony alone is sufficient to support a defendant's conviction for DUI." *State v. Willie R. Harris, Jr.*, No. M2005-00241-CCA-R3-CD, 2006 WL 407779, at *4 (Tenn. Crim. App. Feb. 21, 2006), *perm. app. denied* (Tenn. Sept. 11, 2006) (citing *State v. Vassar*, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993)).

In this case, Deputy Sulewski's testimony described Defendant's demeanor and appearance in detail. Deputy Sulewski smelled a strong odor of alcohol while approaching Defendant's car. Defendant had red, watery eyes and slurred speech. When asked to hand Deputy Sulewski his driver's license, Defendant attempted to give Deputy Sulewski an insurance card. While speaking with Defendant and during the field sobriety tests, Deputy Sulewski described Defendant as swaying back and forth, using the car for support. Defendant admitted to drinking one Long Island Iced Tea and three 24-ounce beers that night. Deputy Sulewski conducted field sobriety tests and identified multiple indicators that were consistent with Defendant being intoxicated.

Aside from the Deputy Sulewski's testimony, the jury viewed the dashboard camera video from Deputy Sulewski's vehicle. The video depicts not only Defendant's actions but also his speech. Jurors were able to assess whether Defendant's speech was slurred and whether Defendant's actions during the one-leg balance or the walk and turn tests indicated intoxication. On the video, Defendant does not successfully complete the one-leg balance test and stumbles slightly during the walk and turn test. Once Deputy Sulewski and Defendant arrive at the hospital, Defendant can be heard saying "I don't want to fall, I might be too drunk." Here, jurors did not have to rely solely on Deputy Sulewski's testimony. Jurors could rely on the dashboard camera video to come to their own conclusions as to Defendant's state of impairment. Furthermore, Defendant argued during the post-conviction hearing, and now argues on appeal, that had trial counsel shown Defendant the video before trial, Defendant would have taken the State's plea offer. While I agree this argument does not meet the burden for ineffective assistance of counsel, this argument does seem to be a concession by Defendant to the highly inculpatory nature of the video.

In Defendant's case, a reasonable jury could have found Deputy Sulewski's testimony regarding Defendant's slurred speech, odor of alcohol, and performance on the field sobriety tests to be credible. A reasonable jury (and apparently Defendant) could have found the dashboard-video evidence inculpatory and corroborative of Deputy Sulewski's testimony. Thus, even if the blood-sample evidence is excluded, the conviction for DUI by impairment should be upheld based on the other available evidence at trial. Therefore, I respectfully dissent.

_____
TIMOTHY L. EASTER, JUDGE