Richard PENDERGRASS,
Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 71A03–0712–CR–588.

Court of Appeals of Indiana.

July 8, 2008.

Jeffrey E. Kimmell, South Bend, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, J.T. Whitehead, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Richard Pendergrass (Pendergrass), appeals his conviction for two Counts of child molesting, Class A felonies, Ind.Code § 35–42–4–3.

Affirmed.

### ISSUES

Pendergrass raises two issues on appeal, which we restate as follows:

(1) Whether the trial court abused its discretion by admitting several exhibits and related testimony concerning deoxyribonucleic acid (DNA) test results without the testimony of the laboratory technician who performed the actual testing; and

(2) Whether Pendergrass' confrontational rights pursuant to the Sixth Amendment of the United States Constitution were violated when he was denied the opportunity to confront and cross-examine the laboratory technician who performed the DNA analysis.

### FACTS AND PROCEDURAL HISTORY

C.P., born on June 8, 1989, is the daughter of D.W. (Mother) and Pendergrass. C.P.'s parents divorced when she was approximately one and one half years old. Originally, C.P. and her siblings lived with

their Mother; however, when C.P. was eleven years of age, the children moved in with Pendergrass and his extended family in a residence located in South Bend, Indiana. Pendergrass, C.P., and her younger sister, J.P., shared a downstairs bedroom. Pendergrass slept in a bed, while the girls slept on blankets on the floor.

C.P. was eleven years old when Pendergrass started to touch her inappropriately. The first time it happened, C.P. was asleep and Pendergrass touched her vagina while she was clothed. She woke up and told him to stop. Pendergrass complied. After that time, Pendergrass gave C.P. pills every night which C.P. believed to be sleeping pills. According to C.P.'s sister, the drugs Pendergrass gave to C.P. were red pills that left C.P. acting "dumb, like dumbfounded" or "slow" mentally. (Transcript p. 277). Pendergrass also gave J.P. cold medicine, such as Nyquil. Even though the pills Pendergrass gave her would usually make her "black out," at times, she would wake up. (Tr. p. 76). C.P. remembered Pendergrass sitting next to her on the floor and touching her vagina under her clothes, sometimes inserting his fingers into her vagina. Whenever he put his fingers inside of her vagina, it made her feel "dirty." (Tr. p. 73–74). On several occasions, he would also kiss her by putting his tongue in her mouth. There were times that C.P. woke up in Pendergrass' bed, with her clothes off and Pendergrass on top of her. Although C.P. had no recollection of feeling anything, afterwards, she would notice an abnormal discharge in her underwear.

When she was thirteen, C.P. began feeling ill and Pendergrass took her to see a doctor. Given her symptoms, the doctor asked C.P. for a urine sample. Following the results of the urine sample, the doctor informed C.P. and Pendergrass that she was pregnant. On Mother's Day, May 11, 2003, C.P. informed her Mother that she was pregnant and that Pendergrass was the father of her unborn child. Mother notified the St. Joseph County Police Department, specifically speaking to Detective Steven Metcalf (Detective Metcalf).

As a result of the police report, Metcalf investigated Pendergrass. In June of 2003, C.P., accompanied by her Mother, had an abortion. Following C.P.'s abortion, Detective Metcalf took possession of the fetus for DNA testing. He also collected a buccal swab from C.P. and a blood sample from Pendergrass for DNA testing. All the evidence was tagged and properly stored in the freezer located at the St. Joseph County Police Post. Although Detective Metcalf "firmly believed that [he] had sent these items to the [Indiana State Police Laboratory]," he never actually did so. (Tr. p. 308). It was not until May of 2006 that Detective Metcalf discovered his omission and the evidence was sent to the Indiana State Police Laboratory for DNA testing. After testing, it was determined that given the paternity index results, there was a 99.9999 percent likelihood that Pendergrass was the father of the fetus aborted by C.P.

On June 11, 2006, the State filed an Information, charging Pendergrass with two Counts of child molesting, Class A felonies, Ind.Code § 35–42–4–3. On October 1, 2007, a jury trial commenced. During the trial, the trial court admitted, over the objection of defense counsel, three exhibits concerning the DNA testing and testimony related thereto. Four days later, on October 5, 2007, the jury found Pendergrass guilty as charged. On November 1, 2007, at the sentencing hearing, the trial court sentenced Pendergrass to forty years incarceration on Count I and twenty-five years incarceration on Count II, with sentences to run consecutively.

Pendergrass now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Admission of Evidence*

Initially, Pendergrass contends that the trial court abused its discretion when it admitted, over his objection, the test results from the DNA analysis performed by the Indiana State Police Laboratory and testimony related thereto. We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Sullivan Builders & Design, Inc. v. Home Lumber of New Haven, Inc.*, 834 N.E.2d 129, 133 (Ind.Ct.App.2005), *reh'g denied, trans. denied.* An abuse of discretion occurs if a trial court's decision is clearly against the logic and effect of the facts and circumstances before the court. *Id.* Moreover we will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

Specifically, Pendergrass contests the admission of three particular exhibits, *i.e.,* State's Exhibits 1, 2, and 3. State's Exhibit 1 is a Certificate of Analysis, prepared by forensic biologist, Daun C. Powers (Powers), employed by the Indiana State Police Laboratory. The Exhibit reflects the results of Powers' DNA extraction from a tissue sample from the arm of the fetus, the buccal swab taken from C.P., and Pendergrass' blood sample. State's Exhibit 2, also prepared by Powers, contains the development of Pendergrass', C.P.'s, and the fetus' "Profiles for Paternity Analysis." (Appellant's App. p. 2). The Exhibit provides the information necessary to establish paternity between the individuals, if any. This information was subsequently submitted to Dr. Michael Conneally, M.D. (Dr. Conneally), a retired professor of human genetics, human genetic disorders and DNA at Indiana University Medical Center in Indianapolis. State's Exhibit 3 is

the Paternity Index, as prepared by Dr. Conneally, which establishes a 99.9999% probability of Pendergrass being the fetus' biological father.

Pendergrass' overarching claim with regard to all three exhibits focuses on the purported hearsay statements contained within each document. With respect to Exhibits 1 and 2, which were admitted at trial through the testimony of Lisa Black (Black), Powers' supervisor at the Indiana State Police Laboratory, Pendergrass asserts that the documents include hearsay statements and thus can only be admitted if the documents fall within one of the recognized hearsay exceptions. In this light, Pendergrass disputes the Exhibits' admissibility based on Indiana Evidence Rule 803(8)(a through d) which prohibits the introduction of investigative reports by police and other law enforcement personnel. With regard to the admission of State's Exhibit 3, which was introduced through Dr. Conneally's testimony, Pendergrass objects that the document was based almost completely on the "impermissible hearsay findings of [Powers]." (Appellant's Br. p. 5). On the other hand, the State asserts that all three Exhibits were properly admitted under the business record exception to the hearsay rules. *See* Ind. Evid. Rule 803(6).

As the use of DNA analysis has become prevalent in criminal cases, it came as a surprise to this court that after a thorough review of the case law, no precedent exists establishing how documents explaining the underlying analysis of DNA testing may be admitted at a criminal trial. We will discuss the admissibility of each Exhibit in turn.

### A. *State's Exhibit 1*

As mentioned before, State's Exhibit 1 is a Certificate of Analysis which compiled the results of Powers' DNA extraction

from a tissue sample from the arm of the aborted fetus, from C.P.'s buccal swab, and from Pendergrass' blood sample. Pendergrass contests this admission, arguing that the document was inadmissible under each of the four exceptions of Evid. R. 803(8).

Indiana Evidence Rule 803(8) states:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

(8) **Public Records and Reports.** Unless the sources of information or other circumstances indicate lack of trustworthiness, records, reports, statements, or data compilations in any form, of a public office or agency, setting forth its regularly conducted and regularly recorded activities, or matters observed pursuant to a duty imposed by law and as to which there was a duty to report, or factual findings resulting from an investigation made pursuant to authority granted by law. The following are not within this exception to the hearsay rule: (a) investigative reports by police and other law enforcement personnel, except when offered by an accused in a criminal case; (b) investigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party; (c) factual findings offered by the government in criminal cases; and (d) factual findings resulting from special investigation of a particular complaint, case, or incident, except when offered by an accused in a criminal case.

Pendergrass asserts that Exhibit 1 is either an investigative report excluded by subsections (a) and (b) or a factual finding excluded by subsections (c) and (d). The State, on the other hand, claims that Exhibit 1 was properly admitted pursuant to Evid R. 803(6), records of regularly conducted business activity.

■ The words "DNA test results" are not magic words which, once uttered, cause the doors of admissibility to open. Although Indiana Code § 35–37–4–13(b)[1] makes DNA evidence per se admissible without an inquiry into whether the evidence is scientifically reliable in a particular case, the statutory language merely establishes the reliability of the evidence and the party introducing the evidence will still need to comply with the customary rules of evidence.

Here, State's Exhibit 1 was compiled by Powers and admitted at trial through the testimony of Black, Powers' supervisor at the Indiana State Police Laboratory. Black testified that she supervises nine employees, reviews the testing process, and oversees the general quality control of the work performed at the laboratory. She provides both the technical and administrative review of the DNA testing done by the laboratory. Black clarified the general DNA testing procedures to the jury and stated that she specifically reviewed Powers' testing of the DNA samples taken from C.P.'s fetus, C.P., and Pendergrass.

In *Jenkins v. State,* 627 N.E.2d 789 (Ind.1993), *reh'g denied, cert. denied,* 513

1. Indiana Code § 35–37–4–13 provides:
**"Forensic DNA analysis" defined; admissibility**
(a) As used in this section, "forensic DNA analysis" means an identification process in which the unique genetic code of an individual that is carried by the individual's deoxyribonucleic acid (DNA) is compared to genetic codes carried in DNA found in bodily substance samples obtained by a law enforcement agency in the exercise of the law enforcement agency's investigative function.
(b) In a criminal trial or hearing, the results of forensic DNA analysis are admissible in evidence without an antecedent expert testimony that forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material.

U.S. 812, 115 S.Ct. 64, 130 L.Ed.2d 21 (1994), our supreme court was asked to decide whether a technician's laboratory notes concerning DNA testing fall within the business record exception to the hearsay rule where the trial court admitted the documents through the technician's supervisor's testimony. *Id.* at 794. For purposes of its analysis, the *Jenkins'* court assumed "for the sake of argument that the laboratory notes do not fall under the business record exception." *Id.* Instead of investigating the admissibility of the technician's notes, the supreme court focused on the expert who based his opinion on the contested notes and stated that "[a]n expert is allowed to base an opinion on facts or data that are not admissible in evidence if they are of the type reasonably relied upon by experts in the field." *Id.* Thus, the court concluded that as these laboratory notes are used by every supervisor involved in DNA testing, admission is harmless because of use by the expert witness. *Id.*

■ While we agree with the ultimate result reached in *Jenkins*—admissibility of the documents—we will address the issue disregarded by the *Jenkins'* court, *i.e.*, whether documents created by a laboratory technician at the Indiana State Police Laboratory concerning DNA analysis are admissible under the exceptions to the hearsay rules. However, unlike *Jenkins*, we do not believe the business record exception pursuant to Evid. R. 803(6) [2] comes into play. It does not appear to us that the Indiana State Police Laboratory depends on State's Exhibit 1, the Certificate of Analysis, to operate its business. Rather, the report is compiled for the sole benefit of the State to pursue an action against Pendergrass. Unlike financial statements, inventory records, or other administrative or operational documents traditionally allowed under the business records exception, State's Exhibit 1 appears to be a substantive end product of a service offered by the Indiana State Police Laboratory to a government agency and which becomes the permanent property of that agency. *See, e.g., In re Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 645 (Ind.2004) (report compiled by social services agency describing home visits and supervised visits are not admissible under the business records exception to the hearsay rule as this report was a service offered by the social services agency and the report would become the permanent property of an external government agency). As such, State's Exhibit 1 cannot be characterized as a record "kept in the course of a regularly conducted business activity." *See* Evid. R. 803(6).

■ At first glance, State's Exhibit 1 appears to fall squarely within the first part of the public records exception as stipulated by Evid. R. 803(8). A Certificate of Analysis prepared by an employee of the Indiana State Police Laboratory is clearly a report of a public agency setting forth factual findings resulting from an

**2.** Indiana Evidence Rule 803(6) provides as follows:

**Records of Regularly Conducted Business Activity.** A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony or affidavit of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness. The term "business" as used in this Rule includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

investigation made pursuant to authority granted by law. *See* I.C. § 10–13–6–6(2). However, Evid. R. 803(8) continues and excludes some statements from its exception to the hearsay rule. Pendergrass now maintains that the trial court should have found State's Exhibit 1 inadmissible as it is excluded under all four exceptions to the public records rule: (a) investigative reports by police and other law enforcement personnel, except when offered by an accused in a criminal case; (b) investigative reports prepared by or for a government, a public office, or an agency when offered by it in a case in which it is a party; (c) factual findings offered by the government in criminal cases; and (d) factual findings resulting from special investigation of a particular complaint, case, or incident, except when offered by an accused in a criminal case.

Our supreme court analyzed the "factual findings offered by the government in criminal cases" exclusion in depth in *Ealy v. State*, 685 N.E.2d 1047 (Ind.1997) and crafted a three-step test for determining the admissibility of hearsay under that subpart. The *Ealy* test has since been extended to all of the exclusions listed in Evid. R. 803(8). *See Shepherd v. State*, 690 N.E.2d 318, 326 n. 2 (Ind.Ct.App.1997), *trans. denied; Bailey v. State*, 806 N.E.2d 329, 333–34 (Ind.Ct.App.2004), *trans. denied.*

Application of the *Ealy* test mandates that a court first determine whether the report or record contains findings that address a materially contested issue in the case. *Ealy*, 685 N.E.2d at 1054. If the inquiry in the first step is answered in the negative, the analysis ends there and the record or report is not rendered inadmissible on hearsay grounds. *Id.* Otherwise, the court must proceed to the second step, which requires the court to determine if the record or report contains factual find-

ings. *Id.* Factual findings are conclusions drawn by an investigator from the facts. *Id.* at 1051. This would be in contrast to "simple listings, or a simple recordation of numbers and the like." *Id.* at 1054. If the record or report does contain factual findings, then the court must move on to step three and determine whether the report was prepared for advocacy purposes or in anticipation of litigation. *Id.* If the report or record was prepared for advocacy purposes or in anticipation of litigation, then it is inadmissible hearsay. *Id.* Even if the trial court determines that the record or report clears that final hurdle, the record or report may be inadmissible if it is not relevant or if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *See* Evid. R. 402 and 403.

Applying the first *Ealy* step to the facts of this case, we conclude that the Certificate of Analysis does not relate to a materially contested issue before the trial court. State's Exhibit 1 is a compilation of data derived from the DNA analysis of the fetus, C.P., and Pendergrass. This mere compilation is not contested by Pendergrass. As the inquiry into the first step is answered in the negative, State's Exhibit 1 is not inadmissible on hearsay grounds. However, even proceeding to the second step, we find that State's Exhibit 1 does not contain factual findings as defined by *Ealy*. Rather, Powers detailed in State's Exhibit 1 the evidence received from the St. Joseph County Police Department for further analysis and recorded the results of the DNA analysis on the fetus, C.P.'s buccal swab, and Pendergrass' blood as observed by her. As such, the contested exhibit is a recording of physical conditions as they were observed by Powers akin to a simple recordation of numbers and therefore admissible under the *Ealy* test. Consequently, we conclude that the trial court

did not abuse its decision by admitting State's Exhibit 1. *See Sullivan Builders & Design, Inc.,* 834 N.E.2d at 133.

### B. *State's Exhibit 2*

■ State's Exhibit 2, also prepared by Powers and admitted at trial through Black's testimony, contains the development of Pendergrass', C.P.'s, and the fetus' "Profiles for Paternity Analysis." (Appellant's App. p. 8). The Exhibit specifies sixteen markers present in an individual's DNA sample as a numerical value. Here, too, Pendergrass contests the admission of the document asserting it falls within one of the exceptions of the public records rule of Evid. R. 803(8).

As with State's Exhibit 1, State's Exhibit 2 was properly admitted at trial. Application of the *Ealy* test indicates first that the Profiles for Paternity Analysis does not relate to a materially contested issue before the trial court. State's Exhibit 2 is a numerical, uncontested compilation of data derived from the DNA analysis of the fetus, C.P., and Pendergrass. As the first inquiry into the first step is answered in the negative, State's Exhibit 2 is not inadmissible on hearsay grounds. However, even applying the second step, we find that State's Exhibit 2 does not contain factual findings as defined by *Ealy*. Rather, in State's Exhibit 2, Powers assigns numerical values to the sixteen markers found in the DNA samples of the fetus, C.P., and Pendergrass. She does not interpret the values, reach a conclusion or infer anything from the enumeration. As such, the contested Exhibit is, like State's Exhibit 1, a mere recording of physical conditions as they were observed by Powers and therefore admissible under the *Ealy* test. Consequently, we conclude that the trial court did not abuse its discretion by admitting State's Exhibit 2. *See Sullivan Builders & Design, Inc.,* 834 N.E.2d at 133.

### C. *State's Exhibit 3*

■ State's Exhibit 3 represents the Paternity Index, as prepared by Dr. Conneally, which establishes a 99.9999 percent probability of Pendergrass being the fetus' biological father. This document was admitted at trial through the testimony of its author, Dr. Conneally. His testimony clarified that although he authored the Paternity Index and calculated the probability score, this result was entirely based upon his interpretation of the numerical values contained in State's Exhibit 2, the Profiles for Paternity Analysis. Pendergrass disputes the admissibility of Exhibit 3, claiming that the "State may not use an expert as a conduit to introduce the hearsay statements of another witness that it has failed to produce." (Appellant's Br. p. 7).

Initially, we note that State's Exhibits 1 and 2 were properly admitted as exceptions to the hearsay rule pursuant to Evid. R. 803(8). These exhibits had been admitted prior to Dr. Conneally taking the stand. Accordingly, Dr. Conneally did not introduce hearsay statements when discussing his expert opinion concerning Pendergrass' probability of being the fetus' biological father.

Furthermore, with regard to expert testimony, Indiana's Rule of Evidence 703 specifies:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. Experts may testify to opinions based on inadmissible hearsay, provided that it is of the type reasonably relied upon by experts in the field.

Here, it is not only statutorily enacted in I.C. § 35-37-4-13 that "forensic DNA analysis provides a trustworthy and reliable method of identifying characteristics in an individual's genetic material," but Dr.

Conneally also testified that the only method of calculating paternity is by reliance and reference to State's Exhibits 1 and 2. He clarified that this method is universally used within the scientific community. Accordingly, we conclude that State's Exhibit 3 was properly admitted at trial.

## II. *Confrontation Rights*

■ Lastly, Pendergrass contends that the trial court erred by admitting evidence in violation of his Sixth Amendment right to confront and cross examine witnesses pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In particular, he maintains that as State's Exhibits 1 and 2 are testimonial in nature, the documents should have been introduced through Powers' trial testimony, unless the State had established that she was unavailable to testify and Pendergrass had a prior opportunity for cross-examination.

The Confrontation Clause of the Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." In *Crawford*, the United States Supreme Court determined that the Confrontation Clause bars "admission of testimonial statements of a witness who [does] not appear at trial unless he [is] unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53–54, 124 S.Ct. 1354. In essence, *Crawford* drew a line between testimonial and non-testimonial hearsay without providing a definition of testimonial evidence,[3] granting the State latitude for developing their hearsay laws in relation to non-testimonial hearsay. *See Richardson v. State*, 856 N.E.2d 1222, 1230 (Ind.Ct.

App.2006), *trans. denied.* However, the Supreme Court did comment on existing hearsay exceptions, stating "[m]ost hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56, 124 S.Ct. 1354.

■ Even without deciding whether the public records exception of Evid. R. 803(8) is one of the existing hearsay exceptions that covers non-testimonial statements, we find that State's Exhibits 1 and 2 are not subject to the strictures of *Crawford*. It is well established that the Confrontation Clause does not apply to statements admitted for reasons other than proving the truth of the matter asserted. *Id.* at 59 n. 9, 124 S.Ct. 1354 (citing *Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985)). Here, State's Exhibits 1 and 2 were not admitted to prove that Pendergrass molested C.P., instead they merely provided context for Dr. Conneally's opinion. Both documents clarify the procedures and basis for the parental probability percentage as calculated by Dr. Conneally. In sum, we conclude that the admission of State's Exhibits 1 and 2 did not implicate Pendergrass' right to confront the witnesses against him.

## CONCLUSION

Based on the foregoing, we conclude that the trial court properly admitted State's Exhibits 1, 2, and 3 and related testimony concerning DNA analysis and the subsequent test result without the testimony of the laboratory technician who performed the actual testing; and Pendergrass' confrontational rights pursuant to the Sixth Amendment of the United States

---

**3.** We note that *Crawford* has been expanded upon and clarified by *Hammon v. State,* which was decided together with *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), but do not believe those decisions affect our result in the instant case.

Constitution were not implicated when he was denied the opportunity to confront and cross-examine the laboratory technician who performed the DNA analysis.

Affirmed.

ROBB, J., concurs.

BAKER, C.J., concurs in result with separate opinion.

BAKER, Chief Judge, concurring in result.

I concur in the result reached by the majority and in the analysis it applied to reach that result. I write separately to add that Pendergrass raises no challenge to C.P.'s testimony. Therefore, even if the exhibits at issue had been admitted erroneously, I believe that the error would have been harmless because C.P.'s testimony that Pendergrass molested her would, on its own, have been sufficient to support Pendergrass's conviction.