ATTORNEYS FOR APPELLANT
Jeffrey E. Kimmell
South Bend, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

J.T. Whitehead
Deputy Attorney General

Scott Barnhart
Deputy Attorney General
Indianapolis, Indiana



FILED
Sep 24 2009, 3:03 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 71S03–0808–CR–00445

RICHARD PENDERGRASS,

*Appellant (Defendant below),*

v.

STATE OF INDIANA,

*Appellee (Plaintiff below).*

Appeal from the St. Joseph Superior Court, No. 71D03–0607–FA–0034
The Honorable Jerome Frese, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 71A03–0712–CR–00588

**September 24, 2009**

**Shepard, Chief Justice.**

Richard Pendergrass was convicted of two counts of child molesting based in part on DNA evidence showing he was very likely the father of the victim's aborted fetus. The State's witnesses to this effect were a laboratory supervisor with direct knowledge of the processing of

the samples and an expert DNA analyst who used the laboratory's print-outs to render an opinion. Pendergrass contends his rights under the Confrontation Clause were violated because the State did not present the technician who ran the samples through the laboratory's equipment. We conclude that the proof submitted was consistent with the Sixth Amendment as recently detailed in Melendez-Diaz v. Massachusetts.

## Facts and Procedural History

This case commenced when the State charged Richard Pendergrass with two counts of child molesting, class A felonies. Ind. Code § 35–42–4–3 (2007).

At trial, C.D., Pendergrass's daughter, testified that he had started touching her inappropriately when she was eleven years old. At age thirteen, when she began to feel ill, Pendergrass took her to the doctor, who told them she was pregnant. C.D. told her mother of her pregnancy and its cause, and C.D.'s mother then reported Pendergrass to the police. Soon after, C.D. had an abortion.

Two witnesses testified at trial concerning DNA evidence demonstrating the likelihood that Pendergrass was the father of the fetus. Lisa Black, a supervisor at the Indiana State Police Laboratory, explained the process of test sampling for DNA. (Tr. at 120–97.) Dr. Michael Conneally, a DNA expert who performed the paternity analysis, explained how he came to his conclusions regarding the likelihood that Pendergrass was the father of the aborted fetus. (Tr. at 209–52.) During the testimony given by Black and Conneally, the State presented three documents, two prepared by the Indiana State Police Laboratory in Lowell, Indiana, and one prepared by Conneally. Pendergrass objected to admitting these documents, insisting on Confrontation Clause and hearsay grounds that the State must call the analyst who performed the test in the laboratory. Over Pendergrass's objection the court admitted these documents into evidence.

Exhibit 1 was labeled "Certificate of Analysis," prepared by Daun Powers, a forensic DNA analyst at the Lowell laboratory, and admitted during Black's testimony. This document consisted of an inventory of physical evidence submitted to the lab, a list of the tests performed, and indications of where the evidence and the test results were sent. It did not contain any test results or conclusions. (App. at 6–7.)

Exhibit 2, also admitted while Black was on the stand, was a table of the test results titled "Profiles for Paternity Analysis" and compiled by Powers. (App. at 8; Tr. at 176.) This table did not contain conclusions about paternity, just numbers in columns categorized by abbreviated test labels for each of the three test subjects: Pendergrass, C.D., and the aborted fetus. (App. at 8.)

Black had reviewed Exhibit 2 in the original course of the State Police Laboratory's work. (Tr. at 179–80.) In Black's role as supervisor she performs technical, administrative, and random reviews of the work of DNA analysts at the Lowell and Ft. Wayne laboratories. All DNA case work is reviewed by a second qualified analyst. Black performs some of these technical reviews and all of the other reviews. She performed the technical review of Powers's tests on the evidence at issue in this case. (Tr. at 126–27, 131, 179–81.) Her initials appear next to each of the three samples on the DNA profile, indicating she "confirmed that this paperwork that Ms. Powers was providing to Dr. Conneally was an accurate representation of her results." (App. at 8, Tr. at 179–80.) On the stand Black described the steps Powers took to develop the DNA profiles for each of the three samples. (Tr. at 127.) She described what types of samples were taken from the three subjects based on Powers's notes. (Tr. at 140–42.)

Black testified about the general procedures followed at the laboratory, including receiving, storing, and testing evidence. (Tr. at 126–30, 138–40, 153–55.) Throughout Black's testimony, it was plain enough that Powers had performed the original laboratory processing and that Black had supervised and checked her work. (Tr. at 120–97.) For example, when asked which test was performed first, Black replied, "I don't have any knowledge of that." (Tr. at 153.)

She sometimes relied on Powers's notes for her testimony about the specific tests performed. (Tr. at 140–42.)  For example, when asked if anything indicated a difficulty in creating the DNA profile, Black looked to Powers's notes, which were not admitted into evidence.  (Tr. at 140–42.) She had not reviewed most of Powers's notes for trial.  (Tr. at 145–46.)

During Conneally's testimony the court admitted Exhibit 3, a paternity index table that Conneally created.  (Tr. at 217, 222.)  Conneally used the index to calculate the probability that Pendergrass was the father of the fetus based on the laboratory's test results.  (Tr. at 214, 216, 222.)  Given the paternity index results, there was a 99.9999 percent likelihood that Pendergrass was the father of the fetus that C.D. aborted, or, in other words, Pendergrass was 2.8 million times more likely to be the father than a random man.  (Tr. at 215–26.)

The jury returned guilty verdicts on both counts.  The trial court sentenced Pendergrass to consecutive terms of 40 years on Count I and 25 years on Count II.  (App. at 3.)  The Court of Appeals affirmed.  Pendergrass v. State, 889 N.E.2d 861 (Ind. Ct. App. 2008).  We granted transfer.  898 N.E.2d 1219 (Ind. 2008) (table).

## I.      Pendergrass Was Not Denied His Right of Confrontation.

The Sixth Amendment to the United States Constitution, made applicable to the States via the Fourteenth Amendment, states:  "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination. Crawford v. Washington, 541 U.S. 36 (2004).

Crawford overturned the rule announced in Ohio v. Roberts, 448 U.S. 56, 72 (1980), which permitted hearsay statements as long as they bore what the Roberts opinion described as

the "indicia of reliability." Crawford, 541 U.S. at 68. Crawford dispensed with this substantive understanding of the Confrontation Clause in favor of a procedural one, stating,

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination . . . . Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty. This is not what the Sixth Amendment prescribes.

541 U.S. at 61–62.

In determining the types of evidence to which the Confrontation Clause applies, Crawford turned to definitions of language from the text itself: "It applies to 'witnesses' against the accused—in other words, those who 'bear testimony.' 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" Crawford, 541 U.S. at 51, (quoting 2 N. Webster, An American Dictionary of the English Language (1828)).

"Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." Crawford, 541 U.S. at 68–69. While the Crawford court intentionally refrained from defining what evidence is "testimonial," it listed three "formulations of this core class of 'testimonial' statements":

> (1) *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially;

5

(2) extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions;

(3) statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

Crawford, 541 U.S. at 51–52 (numbers added).

Crawford emphasized that the Sixth Amendment's very essence is to protect against abuses of government officials. "Involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse—a fact borne out time and again throughout a history with which the Framers were keenly familiar." Crawford, 541 U.S. at 56 n.7. The opinion later claimed that the "Framers would be astounded to learn that *ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." Crawford, 541 U.S. at 66.

Therefore, says Crawford, the text, taken with traditional exceptions, means that the Sixth Amendment does not permit the admission of "testimonial" statements of a witness who does not appear at trial unless he or she is unavailable to testify and the defendant had a prior opportunity for cross-examination. Crawford, 541 U.S. at 53–54.

Since Crawford, the Supreme Court has clarified incrementally the definition of "testimonial." It first excluded from "testimonial" statements whose primary purpose is to enable police assistance but not statements made to police during an investigation. Davis v. Washington, 547 U.S. 813 (2006). Davis clarified that the testimonial statements are those that are substitutes for live testimony, that is "they do precisely *what a witness does* on direct examination . . . ." Davis, 547 U.S. at 830. Because "[n]o 'witness' goes into court to proclaim

6

an emergency and seek help," statements seeking help during an emergency do not classify as "testimonial." Davis, 547 U.S. at 828. By contrast, in the companion case to Davis, Hammon v. Indiana,[1] where the prosecution sought to enter an affidavit by the alleged victim based on conversations with the police in their investigation, the Confrontation Clause barred admission because the officer was seeking to find out "what happened," not "what is happening." Davis, 547 U.S. at 830.

The more recent and most relevant for our purposes is Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009), in which the defendant was convicted for drug crimes based partly on certificates of analysis stating the substance found in seized bags was cocaine of a certain weight, admitted without any live testimony either by the analyst who signed the affidavits or by anyone else. The state processes contemplated that the affidavits were to stand on their own, so no witnesses were called. Melendez-Diaz, 129 S. Ct. at 2531. After concluding that the certificates were "quite plainly affidavits," the Supreme Court held that the affidavits clearly fell within "testimonial" evidence because they "are functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination,'" the analysts swearing their accuracy were "witnesses" for Sixth Amendment purposes, and the defendant was entitled to "be confronted with" the analysts at trial, absent a showing that the analysts were unavailable to testify and the defendant had a prior opportunity to cross-examine them. Melendez-Diaz, 129 S. Ct. at 2532 (quoting Davis v. Washington, 547 U.S. at 830 (2006)).

Concluding that the certificates were the functional equivalent of live, in-court testimony, the Court pointed out that the affidavits were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." Melendez-Diaz, 129 S. Ct. at 2532 (quoting Crawford, 541 U.S. at 52). Indeed, the sole

---

[1] Decided here as Hammon v. State, 829 N.E.2d 444 (Ind. 2005).

purpose of the certificates was to provide "*prima facie* evidence of the composition, quality, and the net weight" of the substance. Melendez-Diaz, 129 S. Ct. at 2532 (quoting Mass. Gen. Laws, ch. 111, §13). This purpose was reprinted on the certificates themselves. Melendez-Diaz, 129 S. Ct. at 2531.

The court characterized its opinion as a "rather straightforward application of our holding in Crawford." Melendez-Diaz, 129 S. Ct. at 2533. As such, we take Melendez-Diaz as another clarifying step, in the vein of Davis, in defining the boundaries of the term "testimonial." Following Melendez-Diaz we will therefore treat the Certificate of Analysis in the present case as testimonial, as it fits the definition of testimony as clarified by Melendez-Diaz.

It is not clear whether more than one analyst signed each certificate in Melendez-Diaz or three different analysts signed each one. We similarly do not know whether the majority insisted that all the analysts involved in the testing should have testified at trial or if fewer than all of them would be permissible. For instance, if the tests were done jointly, it is not clear whether one who participated in the testing would be sufficient. The court gave some clue on such matters from the majority's declaration that its conclusion "does not mean that everyone who laid hands on the evidence must be called," and that the Confrontation Clause leaves discretion with the prosecution on which evidence to present. Melendez-Diaz, 129 S. Ct. at 2532 n.1. That is precisely what the prosecution did in the case before us. It chose to call the laboratory supervisor rather than the laboratory processor. The laboratory supervisor who took the stand did have a direct part in the process by personally checking Powers's test results. (Tr. at 179–80; App. at 8.) As such, she could testify as to the accuracy of the tests as well as standard operating procedure of the laboratory and whether Powers diverged from these procedures.

The prosecution further chose to call an expert to interpret the test results for the jury. Thus, Pendergrass had the opportunity to confront at trial two witnesses who were directly involved in the substantive analysis, unlike Melendez-Diaz, who confronted none at all.

If the chief mechanism for ensuring reliability of evidence is to be cross-examination, Pendergrass had that benefit here. If there were systemic problems with the laboratory processes, Black would be a competent witness, perhaps the ideal witness, against whom to lodge such challenges. Moreover, Black had personal knowledge of the laboratory's work on the specimens at issue as the person who performed the technical review. The State's view is that such an examination of processes is precisely what occurred: "Indeed, Pendergrass effectively cross-examined Black on every step of the evidence testing process, from receipt of the samples from police, through storage, extraction, and comparison." (Appellee's Br. at 13.) After Black left the stand, of course, the State called the expert who actually gave the opinion that the DNA of Pendergrass, C.D., and the fetus matched.

While the prosecution presented its two witnesses, Pendergrass challenges that it did not call the right—or enough—witnesses. The justices of the Supreme Court wrestled some on this question in Melendez-Diaz, although the certificates in that case were not accompanied with any live testimony. 129 S.Ct. at 2531, 2532 n.1, 2546 (Kennedy, J., dissenting). The dissent raised the specter of requiring "in-court testimony from each human link in the chain of custody." Melendez-Diaz, 129 S. Ct. at 2546 (Kennedy, J., dissenting). The majority rejected this characterization of its ruling by stating that it "does not mean that everyone who laid hands on the evidence must be called." Melendez-Diaz, 129 S. Ct. at 2532 n.1.

The Melendez-Diaz majority described the affidavits in that case as including only a "bare-bones statement" that the substance was found to be cocaine and emphasized that the defendant "did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." Melendez-Diaz, 557 129 S. Ct. at 2537. We note that here Pendergrass complains of no such ignorance by the time of trial. In fact, his counsel was thoroughly prepared when the State sought to admit the Certificate of Analysis. (Tr. at 132–37.)

9

Responding to the dissenters' contention that the decision in Melendez-Diaz would require platoons of live witnesses to testify about everything down to and including chain of custody for tested samples, the majority insisted that it would be up to the prosecutors to choose among the many ways of proving up scientific results, as long as the way chosen featured live witnesses. Melendez-Diaz, 129 S. Ct. at 2532 n.1. Here, the prosecution supplied a supervisor with direct involvement in the laboratory's technical processes and the expert who concluded that those processes demonstrated Pendergrass was the father of the aborted fetus. We conclude this sufficed for Sixth Amendment purposes.


## II.        Should the Exhibits Have Been Excluded as Hearsay?


Pendergrass argues that the trial court improperly admitted the State's exhibits 1–3 as hearsay, and the parties exchange arguments about various subsections of Indiana Evidence Rule 803.


One general rule about opinions by qualified experts is that they may rely on information supplied by other persons who have supplied material which the expert regards as material, even if the supplier is not present to testify in court. Ind. Evidence Rule 703; Ealy v. State, 685 N.E.2d 1047, 1056 (Ind. 1997) (trial court did not err by admitting expert testimony based on a properly admitted autopsy report, even if the report had been inadmissible). Medical experts who render an opinion about an individual's mental state on the basis of multiple sources detailing treatment and observation are such an instance. See, e.g., In re A.J., 877 N.E.2d 805, 814 (Ind. Ct. App. 2007) (trial court did not err by admitting expert's testimony as to his treatment recommendations, which were based in part on polygraph results).


The sources upon which Conneally relied might have been subject to a limiting instruction about the purposes for which they were being tendered, but it was not error to admit them.


10

### III.       Conclusion

We affirm the trial court.


Dickson and Sullivan, JJ., concur.
Rucker, J., dissents with separate opinion in which Boehm, J., concurs.

**Rucker, J., dissenting.**

Before <u>Crawford v. Washington</u>, 541 U.S. 36 (2004) as applied in the recent United States Supreme Court decision of <u>Melendez-Diaz v. Massachusetts</u>, 557 U.S. ___, 129 S. Ct. 2527 (2009), I would have agreed with the majority that a defendant's opportunity to cross-examine "a supervisor with direct involvement in the laboratory's technical processes . . ." was sufficient to satisfy the demands of the Sixth Amendment.  Slip op. at 10.  Indeed this jurisdiction has historically admitted documents and testimony containing laboratory results from witnesses other than the experts who actually performed the tests or analyses.  <u>See, e.g.</u>, <u>Ealy v. State</u>, 685 N.E.2d 1047, 1055 (Ind. 1997) (holding that an autopsy report was properly admitted under the public records exception to the hearsay rule); <u>Thompson v. State</u>, 270 Ind. 442, 386 N.E.2d 682, 684 (1979) (holding that an autopsy report was properly admitted under the business records exception to the hearsay rule although the doctor who prepared the report did not sponsor the report at trial and reasoning that the business records exception "does not mean that a sponsor of an exhibit must have personally made it, filed it, or have had first-hand knowledge of the transaction represented by it."); <u>Fowler v. Napier</u>, 663 N.E.2d 1197, 1200 (Ind. Ct. App. 1996) (holding that DNA test results prepared by one doctor and presented at trial by another were properly admitted under the business records exception to the hearsay rule).  However, <u>Melendez-Diaz</u> seems to point in a different direction thus casting considerable doubt on the continued validity of the foregoing authority.

To be sure <u>Melendez-Diaz</u> is not as clear as it could have been in identifying *who* must testify at trial.  As the majority correctly observes, "[t]he justices of the Supreme Court wrestled some on this question . . . ."  Slip op. at 9.  But to support its contention that the prosecutor may introduce into evidence documents prepared by the actual analyst, through a supervisor, the majority relies on certain isolated passages from the <u>Melendez-Diaz</u> opinion.  For example the majority points to comments that not "everyone who laid hands on the evidence must be called"

12

and that "the Confrontation Clause leaves discretion with the prosecution on which evidence to present." Slip op. at 8 (citing Melendez-Diaz, 129 S. Ct. at 2532 n.1). However, these comments were directed at a very narrow proposition concerning chain of custody and not the broader proposition the majority here advances.[2] Indeed immediately preceding the footnoted comment on which the majority relies, the Court was unequivocal: "Absent a showing that the analysts were unavailable to testify at trial *and* that petitioner had a prior opportunity to cross-examine them, petitioner was entitled to 'be confronted with' the analysts at trial." Id. at 2532 (emphasis in original) (quoting Crawford, 541 U.S. at 54).

Also, contrasting the facts in Melendez-Diaz to the facts here, the majority notes that the Court described the affidavits in that case as a "bare-bones statement" and that the defendant in that case "did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed." Slip op. at 9 (quoting Melendez-Diaz, 129 S. Ct. at 2537). Again, however, these comments must be taken in context. The Court itself described them as "illustrative" of its main point which was "[l]ike expert witnesses generally, an analyst's lack of

---

[2] The full quote follows:

> Contrary to the dissent's suggestion . . . we do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody, authenticity of the sample, or accuracy of the testing device, must appear in person as part of the prosecution's case. While the dissent is correct that "[i]t is the obligation of the prosecution to establish the chain of custody," . . . this does not mean that everyone who laid hands on the evidence must be called. As stated in the dissent's own quotation, . . . "gaps in the chain [of custody] normally go to the weight of the evidence rather than its admissibility." It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live. Additionally, documents prepared in the regular course of equipment maintenance may well qualify as nontestimonial records.

Melendez-Diaz, 129 S. Ct. at 2532 n.1 (internal citations omitted) (alteration and emphasis in original).

proper training or deficiency in judgment may be disclosed in cross-examination." Id. at 2537. As the Court also observed, "Confrontation is designed to weed out not only the fraudulent analyst, but the incompetent one as well." Id.

The record is clear that it was Ms. Powers who examined an aborted fetus specimen and buccal swabs taken from C.D., and blood samples apparently taken from defendant Richard Pendergrass, Tr. at 138-42. It was Ms. Powers who conducted a "PCR or polymerase chain reaction" test, Tr. at 124, and ultimately created DNA profiles that were then forwarded to Dr. Conneally of the Indiana University Medical Center for paternity analysis. Tr. at 127, 142. Although the State Police laboratory is qualified to create a DNA profile, it apparently is not qualified to conduct a paternity analysis. Tr. at 127. In any event the "Certificate of Analysis" – a two-page document identifying the evidence received by the laboratory and a summary of the test results – prepared by Ms. Powers and a document entitled "Profiles for Paternity Analysis" – a one-page document detailing the test results – also prepared by Ms. Powers, were admitted into evidence through the testimony of Ms. Powers' supervisor, Ms. Black. It was on the basis of the Profiles for Paternity Analysis that Dr. Conneally reached his conclusion that Pendergrass was the father of the aborted fetus. But, Ms. Powers was never subjected to the rigors of cross-examination on either the examination she performed, the testing she conducted, or the results she reached.

The record shows that Ms. Black testified at length about DNA evidence generally and the specific procedures her office used to map DNA. As to her role, Ms. Black testified, "As the supervisor obviously I supervise nine people. I review their work. I make the case assignments. I make sure the quality control of the entire unit is what it's supposed to be." Tr. at 121. She further testified:

> I do regular reviews of their case work. I do some technical – all
> DNA case work has to be reviewed by another qualified analyst
> which is a technical review. I do some of those. I also do some
> administrative reviews which means then after it's been technically

14

reviewed they are administratively reviewed. I also do quarterly. I do just the regular – randomly pull cases out and review again for the quality of the work. And I can do all of those on any particular case of my choice.

Tr. at 122. Ms. Black testified that she recalled the particular case of Richard Pendergrass, that she reviewed the testing in that case, and that she indicated that review by writing her four digit number on the bottom. Tr. at 126-27, 131. Specifically she said, "Those are my initials that I confirmed that this paperwork that Ms. Powers was providing to Dr. Conneally was an accurate representation of her results." Tr. at 179.

There is no evidence Ms. Black did anything more than rubber stamp the results of Ms. Powers' work. And the question thus presented is whether those results are in fact accurate. Ms. Black did not testify that she observed Ms. Powers perform any examination of the laboratory specimens or conduct any tests. Obviously Ms. Black could not testify whether Ms. Powers diverged from standard laboratory procedures or how carefully or competently she performed the specific analyses. Although a supervisor might be able to testify to her charge's general competence or honesty, this is no substitute for a jury's first-hand observations of the analyst that performs a given procedure; and a supervisor's initials are no substitute for an analyst's opportunity to carefully consider, under oath, the veracity of her results. "Confrontation is one means of assuring accurate forensic analysis." Melendez-Diaz, 129 S. Ct. at 2536.

In sum, despite whatever ambiguity Melendez-Diaz may have created on the question of *who* must testify at trial, it appears to me the opinion is clear enough that a defendant has a constitutional right to confront at the very least the analyst that actually conducts the tests. "A witness's testimony against a defendant is thus inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination." Id. at 2531 (citing Crawford, 541 U.S. at 54). Because Ms. Powers did not appear at trial, and because there was no evidence of her unavailability or a prior opportunity for Pendergrass to cross-examine her, the trial court erred by admitting into evidence Ms. Powers' testimony by way of

15

the Certificate of Analysis and Profiles for Paternity Analysis.  I therefore respectfully dissent on this issue.

Boehm, J., concurs.